MOLOKAI HOMESTEADERS COOPERATIVE ASSOCIATION, SAMUEL M. PETERS, SR., ROSE MAY PETERS ENOS, LUCY FLORES, HARRY KEALOHA, MARAEA K. PAWN, SR., AMOY DACUYCUY, ELIZABETH BARTOLOME, EDWARD K. PELEKAI, MARTHA NAEOLE, ELIZABETH MAKAIWI, JAMES MAWAE, JR., ANNIE KAAWA, RUTH AWAI, JOAN MOLLENA, EDMUND J. KAIMIKANA, PARKER ENGLISH, PHILIP I. ESTERMANN, SAMUEL M. PETERS, JR., and WALTER RITTE, JR., Plaintiffs-Appellants, *v.* CHRISTOPHER COBB, Individually and as Chairman, Board of Land and Natural Resources, State of Hawaii; BOARD OF LAND AND NATURAL RESOURCES, State of Hawaii; KALUAKOI CORPORATION, a Hawaii corporation; and COUNTY OF MAUI, Defendants-Appellees

NO. 6403

JUNE 19, 1981

RICHARDSON, C.J., OGATA, MENOR, LUM, NAKAMURA, JJ.

454

## OPINION OF THE COURT BY NAKAMURA, J.

This case represents the last in a series of legal challenges to the validity of the agreement between Defendant-Appellee Board of Land and Natural Resources of the State of Hawaii (hereafter the Board), and Defendant-Appellee Kaluakoi Corporation (hereafter Kaluakoi) for the use of the transmission facilities of the Molokai Irrigation System (hereafter the System) by Kaluakoi to transport water to its resort complex on the west end of the island of Molokai.

The initial challenge was mounted in the United States District Court for the District of Hawaii by the Molokai Homesteaders Cooperative Association (hereafter the Homesteaders), a plaintiff-appellant here also, and other individual plaintiffs. The suit sought to enjoin the Board, which manages the System, from entering into the proposed agreement with Kaluakoi on grounds that federal statutes had been violated and on a further basis that an executive order of the Governor of Hawaii had been breached.[1] But the requested injunctive relief was denied by the district court,[2] and its decision was affirmed by the United States Court of Appeals for the Ninth Circuit.[3]

After the execution of the agreement, seventy Hawaiian homesteaders, lessees of forty-acre farm lots on Molokai under the Hawaiian Homes Commission Act, brought an action against the Board and Kaluakoi in the Circuit Court of the Second Circuit seeking a declaration that the Board's authorization of the execution of the agreement by its executive officer was invalid due to its failure to comply with the provisions of HRS Chapters 91, 171, and 174, and injunctive relief. Following a non-jury trial, the court entered judgment in favor of the Board and Kaluakoi, which we affirmed in *Ah Ho v. Cobb,* 62 Haw. 546, 617 P.2d 1208 (1980).

---

[1] The statutory provisions invoked were 43 U.S.C. § 371 *et seq.* (reclamation and irrigation) and 42 U.S.C. § 4321 *et seq.* (National Environmental Policy Act of 1969). The executive order invoked was the Executive Order of August 23, 1971, relating to environmental impact statements.

[2] Molokai Homesteaders Coop. Ass'n v. Morton, 356 F. Supp. 148 (D. Haw. 1973).

[3] Molokai Homesteaders Coop. Ass'n v. Morton, 506 F.2d 572 (9th Cir. 1974).

In the case on appeal, the Homesteaders and several individual plaintiffs sought similar relief in the Circuit Court of the First Circuit, but on different grounds. They allege the agreement is void because (1) the Board was not endowed by HRS Chapter 175 with authority to enter into an agreement with Kaluakoi for the use of the pipeline and other transmission facilities, (2) the Board neglected to adopt environmental standards and guidelines as mandated by HRS Chapter 344 prior to the consummation of the agreement, and (3) no environmental impact statement as required by HRS Chapter 343 had been sought by the Board. As we find the averments related to Chapter 175 lack substance, Chapter 344 does not call for the adoption of specific guidelines covering each agency determination, and Kaluakoi's proposal and Board approval thereof antedated the effective date of the relevant provisions of Chapter 343, we affirm the award of summary judgment to defendants-appellees.

I.

Since the relevant facts and circumstances surrounding this controversy have been described in detail in the earlier opinions,[4] we reiterate only portions thereof bearing directly on the issues confronting us now.

The System's component elements are the Waikolu Valley Diversion Works, a tunnel, feeder mains, a reservoir, and distribution pipelines. They function to deliver water for irrigation from Molokai's windward side to lands at Hoolehua and Mauna Loa, and the System has the capacity to transport twenty-one million gallons of water per day. But prior to the agreement, it was being utilized to deliver only about two million gallons daily. Even after the agreement, it is being operated at approximately one-fourth of its capacity.

In 1972, Kaluakoi submitted a written application to the Board to "rent space" in the System to transport water from its well in central Molokai to a resort complex it planned to develop at the

---

[4] The history of the System's development and the relevant facts and circumstances pertaining to the agreement are recounted in greatest detail in Molokai Homesteaders Coop. Ass'n v. Morton, 506 F.2d 572.

island's west end.[5] A public hearing to discuss the proposal was conducted on October 11, 1972. Before taking action on the application, the Board also filed a statement in compliance with the Executive Order of August 23, 1971, to the effect that a "lease" of part of the System's excess capacity to Kaluakoi for the stated purpose would not have a significant environmental impact.[6] On January 12, 1973, the Board approved the application with modifications, and its executive officer was authorized to negotiate a rental fee for the use of the System's facilities and to enter into an agreement with Kaluakoi. While the terms of the agreement were substantially fixed at this time, the formal contract was not executed until July 11, 1975, after the decision of the federal appellate court had been filed and after the enactment of HRS Chapter 343.[7]

The Homesteaders and several individuals residing on Molokai brought the instant suit on December 15, 1975, naming the Board, its Chairman and Executive Officer Christopher Cobb, Kaluakoi, and the County of Maui as defendants. Defendants moved for summary judgment shortly thereafter and a final order dismissing plaintiffs' claims was filed on August 25, 1976. After a denial of their motion for reconsideration of the foregoing order, plaintiffs filed their appeal to this court.

## II.

Plaintiffs-appellants argue the circuit court should not have decided the case by way of summary judgment because of the complex-

---

[5] It planned to develop 3,404 villas and cottages, 6,605 houses and townhouses in two phases, with an ultimate estimated population of thirty thousand in a previously undeveloped area of Molokai.

[6] Prior to enactment of environmental laws by our legislature (HRS Chapters 343-44), environmental impact statements were required for all "major State actions or projects utilizing State funds and/or State lands, that significantly affect the quality of the human and natural environment" pursuant to executive directive, particularly § 1(b) of Governor Burns' Executive Order of August 23, 1971. The negative determination was sent to and accepted by the Office of the Environmental Quality Commission on December 6, 1972.

[7] The decision of the Court of Appeals for the Ninth Circuit in Molokai Homesteaders Coop. Ass'n v. Morton was filed on October 29, 1974. S.L.H. 1974, c. 246, subsequently codified as HRS Chapter 343, was approved and became effective on June 15, 1974.

ity of the issues and the vast policy implications involved. We agree that in cases of public importance summary judgments should be granted sparingly, and never on limited and indefinite factual foundations. *Leong v. Takasaki,* 55 Haw. 398, 402, 520 P.2d 758, 761 (1974); *State v. Zimring,* 52 Haw. 472, 476, 479 P.2d 202, 204-05 (1970). But where there is no genuine issue as to any material fact and defendants clearly demonstrate they should prevail as a matter of law, the disposition of a case by summary judgment is proper. Rule 56(c), H.R.C.P. A review of the record indicates the relevant facts are undisputed for the most part and none of the disputed facts are material to the legal issues posed for resolution. Hence, we proceed to an examination of relevant legislation and legislative history and applicable legal precepts to determine whether the entry of judgment in favor of defendants-appellees was proper.

A.

Plaintiffs-appellants contend the Board exceeded its powers in contracting with Kaluakoi for the utilization of part of the System's excess capacity to transport water for the latter's purposes. They argue Kaluakoi is neither a consumer for whose benefit the System is maintained nor a domestic water user the law permits the Board to contract with,[8] an argument previously advanced by the Home-

---

[8] HRS § 175-2 describes the Board's powers in the following manner:

In addition to all the powers conferred upon the board of land and natural resources by chapters 171 and 174, the board shall have the powers hereinafter set forth. The board shall have the power to make preliminary surveys and engineering studies, and to construct an irrigation and water utilization project, designed to serve and supply the owners and occupants of lands on the island of Molokai, and to manage, control, operate, and maintain the project in accordance with this chapter. It shall also have the power to contract with domestic water users including the county of Maui. It shall further have the power to contract with the government of the United States or any bureau or agency thereof with regard to the construction or the financing of the system.

The board shall have power to fix, charge, and collect reasonable water rates for service from the water system to defray the cost of operation, maintenance and replacements of the system. It shall also have the right to acquire by eminent domain, water and water sources either above or underground, watersheds, reservoir sites, rights-of-way over lands and property for paths, trails, roads, and landing sites, ditches, tunnels, flumes, reservoirs, and pipelines necessary or

steaders but rejected by the United States Court of Appeals for the Ninth Circuit.

Plaintiffs-appellants, however, claim the federal court's statement in this regard constitutes mere dicta, for only "issues of federal law" were presented to the court. We do not read the federal decision so restrictively.[9] And while there are grounds to rule that a consideration of this question is barred by the doctrine of collateral estoppel,[10] we do not choose to do so. For the plain language of HRS § 175-2 furnishes a sound and ample basis to affirm the circuit court's ruling with respect to the Board's authority.

---

proper for the construction and maintenance of a system for conveying, distributing, and transmitting water for irrigation and domestic use and for such other purposes as may properly fall within the scope of its activities in creating, managing, controlling, operating, and maintaining an irrigation and water utilization system. The right of eminent domain shall be exercised in the manner and under the procedure provided by law.

[9] The decision reads in pertinent part:

Plaintiffs, also for the first time on appeal, argue that the Board is without state statutory authority to enter into a contract with the corporation because, under Hawaii Revised Statutes § 175-2, the only persons with whom the Board is authorized to enter into contracts, in addition to the United States and its agencies, are "domestic water users including the county of Maui." Plaintiffs assert that the corporation is not a "domestic water user."

This is another argument advanced for the first time in plaintiffs' reply brief and which we are therefore not required to notice. However, we do point out that the reference to "including the county of Maui" makes it clear that the term "domestic water users" is not intended to refer exclusively to ultimate users of water for domestic purposes but also embraces distributors of water for domestic use. The corporation will be such a distributor.*

506 F.2d at 578-79. *The footnote here reads:

The doctrine of pendent jurisdiction allows us to reach this purely state law question. United Mine Workers v. Gibbs, 383 U.S. 715, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966).

[10] While collateral estoppel normally would not apply in a situation where some of the parties to a subsequent action are different, recent federal decisions have held otherwise. The United States Supreme Court has applied collateral estoppel liberally to foreclose repeated attempts to litigate issues. It has held that the mutuality doctrine, under which neither party could use a prior judgment against the other unless both parties were bound thereby, no longer applies. In the same case, it further ruled that the offensive use of collateral estoppel by plaintiffs was not necessarily foreclosed in every instance. Parklane Hosiery Co. v. Shore, 439 U.S. 322 (1979); see also Montana v. United States, 440 U.S. 147 (1979). Thus, the fact that some of the plaintiffs here were not parties to the federal suit would not necessarily prevent plaintiffs from being estopped, if we chose to adopt the foregoing federal principles and apply them here.

Though appellants in *Ah Ho v. Cobb, supra,* raised no question on the Board's contracting powers, we nonetheless opened our discussion of the issues there with these remarks:

> The appellants do not dispute the authority of the Board to contract with Kaluakoi. The Molokai Irrigation and Water Utilization Project was established to "serve and supply the owners and occupants on the island of Molokai." HRS § 175-2. The Board has the power to contract with "domestic water users" pursuant to HRS § 175-2, and the term encompasses distributors of water for domestic use such as Kaluakoi.

*Ah Ho v. Cobb, supra,* 62 Haw. at 548, 617 P.2d at 1210-11, *citing Molokai Homesteaders Cooperative Association v. Morton, supra,* 506 F.2d at 579. Appellants here claim Kaluakoi is not a "domestic water user" within the meaning of HRS § 175-2 but present nothing to cause us to doubt the pertinent term covers "distributors of water for domestic use such as Kaluakoi." Like the federal court, we find the statute's inclusion of the County of Maui among the water users with whom the Board is permitted to contract makes it clear that the term

> "domestic water users" is not intended to refer exclusively to ultimate users of water for domestic purposes but also embraces distributors of water for domestic use. The corporation . . . [is] such a distributor.

*Molokai Homesteaders Cooperative Association v. Morton, supra,* 506 F.2d at 579.

## B.

We next consider whether the Board's alleged failure to adopt guidelines in conformity with HRS Chapter 344 prior to the approval of the agreement in question affects its validity. The contention here is that HRS §§ 344-4(1)(A), 344-4(1)(B), and 344-4(6)(B) mandate state agencies to adopt guidelines on population and transportation and that the Board's neglect in this regard invalidated the agreement.[11] For reasons stated hereafter, we conclude

---

[11] HRS Chapter 344 reads in relevant part:

§ 344-4 *Guidelines.* In pursuance of the state policy to conserve the natural resources and enhance the quality of life, all agencies, in the development of

that the lack of such guidelines did not affect the validity of the agreement.

At the outset, we observe that the provisions of HRS Chapter 344 became effective on June 15, 1974, subsequent to the Board's approval of Kaluakoi's application.[12] Although the assertions regarding the effect of the foregoing chapter on the Board's action can be dismissed summarily on this ground,[13] a salutary purpose may be served by our not foregoing this opportunity to interpret the statute.

The provisions of HRS Chapter 344 comprise a policy statement reflecting the concerns and goals of the State of Hawaii in the area of environmental protection in general terms. It was adopted in 1974 by the legislature on recommendations submitted by the Temporary Commission on Statewide Environmental Planning. Sen. Stand. Comm. Rep. No. 1047, in 1974 Senate Journal, at 1160. In a sense the statement resembles § 101 of the National Environmental Policy Act of 1969, 42 U.S.C. § 4331, because § 101 also "is not intimidating in its specificity." W. Rodgers, *Environmental Law* § 7.1, at 698 (1977). But HRS § 344-4, where the environmental considerations that are to guide state agencies in the development of their programs are delineated, refers in three instances to the *adoption* of guidelines by

---

programs, shall, insofar as practicable, consider the following guidelines:
(1) Population.
(A) Recognize population impact as a major factor in environmental degradation and adopt guidelines to alleviate this impact and minimize future degradation;
(B) Recognize optimum population levels for counties and districts within the State, keeping in mind that these will change with technology and circumstance, and adopt guidelines to limit population to the levels determined.
. . . . .
(6) Transportation.
(A) Encourage transportation systems in harmony with the life-style of the people and environment of the State;
(B) Adopt guidelines to alleviate environmental degradation caused by motor vehicles;
(C) Encourage public and private vehicles and transportation systems to conserve energy, reduce pollution emission, including noise, and provide safe and convenient accommodations for their users.

[12] *See* S.L.H. 1974, c. 247, § 2.

[13] *See* discussion, *infra,* where we hold that Chapter 343 which became effective at the same time as Chapter 344 does not apply to the agreement in question.

the agencies. Plaintiffs-appellants rely on these references for support of their position.

Our reading of Chapter 344 as a whole convinces us that it does not lend itself to the reading urged upon us by plaintiffs-appellants. The general lack of specificity in the statement suggests it is primarily a declaration of concerns and goals that does not carry a mandate for the adoption of guidelines before ad hoc decisions are rendered by agencies. The chapter is a broad policy document in tenor and actual wording in spite of HRS §§ 344-4(1)(A), 344-4(1)(B), and 344-4(6)(B). While these provisions call for the adoption of guidelines by state agencies, they are devoid of a necessary specificity in direction that would allow the meaningful development of guidelines by the Board with its limited functions and expertise to alleviate population impact and minimize future degradation, to limit population, and to alleviate environmental degradation caused by motor vehicles in every situation it encounters. That the actual directive in § 344-4 is for a consideration of its guidelines "insofar as practicable" in the development of programs reinforces our belief that the legislature meant thereby to lay a foundation for further legislation and for the evaluation of on-going and future programs by the agencies. And the absence of sanctions for possible non-observance buttresses our conclusion that the provisions of Chapter 344 are only hortatory.[14] Further support for the foregoing conclusion may also be gleaned from relevant legislative history, for the pertinent committee reports evince a definite legislative purpose to do no more than declare a policy and provide a foundation for the development of governmental programs.[15]

---

[14] *See* D. Mandelker, *Environmental and Land Controls Legislation* 313 n.88 (1976), where the author also concludes the policy "statement is hortatory, and carries no sanctions."

[15] The House committee report reads in relevant part:

Your Committee has amended the bill in form and content but adhered to the original purpose of the bill. Generally, your Committee has reduced the bill to a more concise statement of the environmental policy and guidelines which all State and County agencies, in the development of programs shall, insofar as practicable, consider in pursuance of the environmental policy.

Your Committee has determined that the bill setting forth the environmental policy and guidelines to be considered in the development of programs are sufficient for the State and County agencies to carry out the purpose of the bill

## C.

We turn now to the primary issue posed by this appeal, whether the Board should have sought an environmental impact statement (EIS) in conformity with the requirements of HRS Chapter 343 before acting on Kaluakoi's application to "rent space" in the System's transmission facilities.

Plaintiffs-appellants' argument that an impact statement consistent with Chapter 343 was a prerequisite for valid Board action is premised on the chapter's enactment prior to the formal execution of the agreement. To counter this, defendants-appellees rely on the Board's approval of the agreement before the effective date of the relevant legislation. They argue in the alternative that a statement of non-impact filed by the Board in compliance with the 1971 executive order fulfilled the documentary requirements of Chapter 343.[16] We

---

without the need for an express direction therefor in the bill. In this respect, your Committee intends that insofar as practicable, all state and county agencies, boards, and commissions should examine their policies, activities, programs and standards to conform them with the purposes of the bill, and further, recommend legislation or legislative action, as they deem appropriate, to the next legislature, through their respective chief executive officers, in the furtherance of the said purposes.

Hse. Stand. Comm. Rep. No. 559, in 1974 House Journal, at 769, 771.

The Senate committee report reads in relevant part:

The purpose of this Bill is to establish environmental policy for the State and provide guidelines for future development of governmental programs. These goals and guidelines are incorporated in the recommendations made by the Temporary Commission on State-wide Environmental Planning.

Under this Bill it shall be the policy of the State to conserve our natural resources by controlling pollution, by preserving or augmenting natural resources, and by safeguarding the State's unique natural environmental characteristics. It shall further be a State policy to enhance our quality of life by (1) assuring the mutually beneficial interaction between the natural and man-made environments and the population, (2) creating opportunities through diverse economic activities which are stable and in balance with the physical and social environments, (3) establishing communities which provide a sense of identity, wise use of land, efficient transportation, and aesthetic and social satisfaction in harmony with the natural environment which is uniquely Hawaiian, and (4) establishing a commitment on the part of each person to protect and enhance Hawaii's environment and reduce the drain on non-renewable resources.

Sen. Stand. Comm. Rep. No. 1047, *supra*.

[16] Defendants-appellees also argue plaintiffs-appellants' claims are barred by laches and the limitation provisions of HRS § 343-6(a), which was renumbered as § 343-7(a) and amended by S.L.H. 1979, c. 197. We do not reach these questions because we conclude Chapter 343 does not apply to the agreement.

conclude from a review of the facts and the law that Kaluakoi's application, as well as significant agency action, preceded the law's effective date and the law is not subject to retroactive application. And while we affirm the circuit court's award of summary judgment with respect to the averments of purported violations of HRS Chapter 343 on the foregoing grounds, the substantive aspects of the portentous legislation also. deserve discussion here.

1

The genesis of the environmental tandem enacted in 1974; HRS Chapters 343 and 344, is discernible in the National Environmental Policy Act of 1969 (NEPA) where Congress fostered objectives of protecting the environment and improving the decision-making process relative thereto by (1) enlarging the basic mandates for federal agencies through the adoption of a national environmental policy, (2) establishing specific action-forcing procedures for implementation of the policy, (3) creating a Council on Environmental Quality, (4) promoting the development of information on and indices of environmental quality, and (5) providing for an annual report from the Council on progress toward the stated goals. F. Anderson, *NEPA in the Courts* 1 (1973). Our legislature recorded a general policy on environmental protection in HRS Chapter 344 and established specific action-forcing procedures for the implementation of the policy, created an environmental quality commission, and provided for the development and publication of information on environmental decisions in Chapter 343. Thus, the relevant state legislation undoubtedly mirrors NEPA's basic concepts. Elements of the California environmental policy act also have been incorporated in our law. D. Mandelker, *supra,* at 313.

NEPA's § 102(2)(C), 42 U.S.C. § 4332(2)(C), which calls for the preparation of environmental impact statements on proposals for legislation and other federal actions has been characterized as "the heart of NEPA." W. Rodgers, *supra,* § 7.4, at 725. Our counterpart of this key action-forcing provision is HRS § 343-5.[17] An EIS under the

---

[17] This section was formerly § 343-4; it was renumbered and amended in 1979 by S.L.H. 1979, c. 197.

state law is

> an informational document . . . which discloses the environmental effects of a proposed action, effects of a proposed action on the economic and social welfare of the community and State, effects of the economic activities arising out of the proposed action, measures proposed to minimize adverse effects, and alternatives to the action and their environmental effects.

HRS § 343-2(9) (formerly HRS § 343-1(6) ).

The Hawaii law, "by particularizing the subjects of inquiry, calls for a broader range of information than NEPA." *Life of the Land v. Ariyoshi,* 59 Haw. 156, 163, 577 P.2d 1116, 1121 (1978). It also is more expansive than the Model State Environmental Policy Act in that the model law, unlike ours, appears to preclude the consideration of social and economic implications by limiting the environmental impacts and effects includable in an EIS to the physical. D. Mandelker, *supra,* at 153, 164-65. Moreover, HRS Chapter 343 is wider in scope than the federal or the typical state analogue, for the state law covers private actions in certain defined situations and areas. HRS § 343-5(a) (formerly § 343-4(a) ); HRS § 343-2(2) (formerly § 343-1(2) ); W. Rodgers, *supra,* § 7.11, at 811-12. Nevertheless, the prescribed role of the EIS in the state environmental protection scheme is informational. HRS § 343-2(9) (formerly § 343-1(6) ); *Life of the Land v. Ariyoshi, supra,* 59 Haw. at 163, 577 P.2d at 1120.

2.

Defendants-appellees claim the Board's approval of a use of the System's facilities to transport water to Kaluakoi's development did not necessitate the preparation of an EIS. It was not, they say, an action likely to have a "significant effect" upon the environment within the meaning of HRS § 343-2(11) (formerly § 343-1(8) ). We do not affirm the award of summary judgment on the foregoing basis, for we think the action was one with a probable "significant effect."

The critical phrase finds definition in HRS § 343-2(11) as

> the sum of effects on the quality of the environment, including actions that irrevocably commit a natural resource, curtail the range of beneficial uses of the environment, are contrary to the State's environmental policies or long-term environmental goals

as established by law, or adversely affect the economic or social welfare.

When the foregoing is read conjointly with the meaning attached to another pertinent and crucial term discussed earlier, "environmental impact statement," there is no room for the conclusion defendants-appellees seek.

Though a statement of non-impact possibly could have sufficed under the Executive Order of August 23, 1971,[18] the statutory definitions of "significant effect" and "environmental impact statement" dispel any notion that the action in question is not of a genre demanding an impact document. The law definitely contemplates a consideration of the secondary and non-physical effects of a proposal prior to a governmental approval thereof. HRS §§ 343-2(9) and 343-2(11) (formerly §§ 343-1(6) and 343-1(8) ); see D. Mandelker, supra, at 164-65. And the effects to be studied include the socio-economic consequences of a proposed action, as well as its direct physical impact.

We entertain no doubt that the pertinent statutory provisions would mandate the preparation of an EIS if Kaluakoi's application for "rental of space" in the System's facilities were presented to the Board now.[19] A proposal whose approval would facilitate the devel-

---

[18] Section 1(b) of the Executive Order of August 23, 1971 read as follows:

Section 1. *Responsibilities of State Agencies.* Consonant with the purpose of the Environmental Quality Control Act of 1970, the heads of all affected State agencies shall:

. . . .

b. Include, in every recommendation or report on proposals for legislation, and any other major State actions or projects utilizing State funds and/or State lands, that significantly affect the quality of the human and natural environment, a detailed statement by the responsible official on (1) the environmental impact of the proposed action, (2) any adverse environmental effects which cannot be avoided should the proposal be implemented, (3) alternatives to the proposed action, (4) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (5) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented;

The foregoing provisions of the executive order follow NEPA's provisions, particularly 42 U.S.C. § 4332(2)(C)(i) to (v). *See* Molokai Homesteaders Coop. Ass'n v. Morton, *supra,* 356 F. Supp. at 150 n.3.

[19] Interestingly, counsel for a defendant-appellee conceded during oral argument that an EIS probably would be required prior to a present Board approval of an action with similar consequences.

opment of a large resort complex in a previously unpopulated area through the use of the Molokai Irrigation System's pipeline, allow water to be transported from its source to another area, and cause a rise in the salinity of the system's irrigation water would be within the purview of activities covered by Chapter 343. The use of a government pipeline, the implicit commitment of prime natural resources to a particular purpose, perhaps irrevocably, and the substantial social and economic consequences of the governmental approval of the proposal would dictate the preparation of an EIS.

Courts in other jurisdictions also have seen fit to declare the withdrawal of water from one area for transport to another an activity subject to EIS requirements under their laws. *Stempel v. Department of Water Resources*, 82 Wash. 2d 109, 119, 508 P.2d 166, 172 (1973); *accord, Environmental Defense Fund, Inc. v. Coastside County Water District*, 27 Cal. App. 3d 695, 104 Cal. Rptr. 197 (1972).[20] *Contra, Sierra Club v. Cavanaugh*, 447 F. Supp. 427, 433 (D.S.D. 1978) (no EIS required for the construction of a rural water system under NEPA because the growth-producing potential of the system — secondary impacts — would not significantly affect the environment and any development resulting from the availability of water would have to comply with local zoning regulations). The federal decision, however, is not surprising in light of NEPA's narrower treatment of relevant environmental impacts.

3.

Having decided that an EIS would be a prerequisite for present Board approval of a request like Kaluakoi's by virtue of the law

---

[20] In Life of the Land v. Ariyoshi, *supra,* the action proposed was the construction of the Central Maui Water Transmission System. We described the proposal in these terms:

> The Central Maui Water Transmission System is a joint venture between the Board of Water Supply of the County of Maui, Wailea Development Company, and Seibu Real Estate Company, Ltd. The System is to consist of a pipeline beginning in Waiehu in northwest Maui and crossing the central isthmus to Makena in south Maui. The water transmission project will take water being developed from a private source and will provide water to the public in the transmission area. Notices to proceed with the project were issued in the fall of 1977, and work has commenced.

59 Haw. at 157, 577 P.2d at 1117. In a sense, the agreement between the Board and Kaluakoi involves similar commitments of natural resources and policy considerations.

enacted in 1974, we focus on the law's application to a proposal received in 1972 and on which some action had been taken prior to the law's effective date.

The issue hinges upon the legislative intent relative to proposals already approved or pending on the effective date of Act 246, Session Laws of 1974 (subsequently codified as HRS Chapter 343), which provides in part that:

> This Act shall take effect upon its approval. This Act is not retroactive and shall not apply to those actions which have re- ceived approvals from appropriate agencies authorized to ap- prove actions covered by this Act. For those actions pending approval as of the effective date of this Act or for which an applicant requests approval prior to the effective date of initial rules and regulations adopted by the commission, the agency authorized to approve such action, at its discretion, may require a statement from the applicant; provided, that any statement which has been accepted on or before the effective date of rules and regulations shall be deemed to be in compliance with this Act and no further statement shall be required.

S.L.H. 1974, c. 246, § 3. Thus, a legislative purpose to foreclose Chapter 343's application to actions approved prior to its effective date is evident. With respect to pending actions, the agencies autho- rized to approve them are given discretion to seek environmental impact statements. And a statement already accepted is deemed to satisfy the requirements of the Act. In short, a clear design against retroactivity is apparent.

Viewing the significant Board action here as the actual execution of the agreement, plaintiffs-appellants argue the event triggering a need for an EIS meeting Chapter 343's standards followed the effective date of Act 246. Furthermore, they maintain the pertinent act was "agency" action, not "applicant" action; "agency" actions in their view were not insulated against a retrospective operation of the Act, although "applicant" actions may have been. Hence, they main- tain the legislature implicitly but definitely intended that impact statements should be prepared for pending "agency" actions, such as the Kaluakoi proposal.

Plaintiffs-appellants weave a sophisticated, yet not implausible, argument premised on an alleged difference in the treatment of "agency" and "applicant" transactions in § 3 of Act 246. But a

manifest intent to permit the retrospective application of the Act only at an agency's discretion, even for actions pending approval, compels a rejection of plaintiffs-appellants' thesis. The explicit legislative design in this regard renders the putative distinction immaterial in this appeal.[21]

Whether the relevant transaction is characterized as an "agency" action or not, and whether the significant action was the approval or the execution of the agreement, Kaluakoi's proposal was either approved or pending approval when Act 246 became law on June 15, 1974. If approval had been granted prior thereto, the Act does not apply to the action; if the request was awaiting approval, the preparation of an EIS was within the Board's discretion. Since the discretionary authority went unexercised, an impact statement was not a prerequisite for approval.

"No law has any retrospective operation, unless otherwise expressed or obviously intended." HRS § 1-3; *Employees' Retirement System v. Chang,* 42 Haw. 532, 540 (1958). We are unable to sustain plaintiffs-appellants' position for want of a necessary expression of intent that Act 246 should have such effect.

Affirmed.

*Edward Cooper Brown (Philip D. Bogetto* and *Paul McCarthy* with him on the briefs) for plaintiffs-appellants.

*James M. Sattler (Anne L. Williams* with him on the brief) for defendant-appellee Kaluakoi Corporation.

*Edwin P. Watson,* Deputy Attorney General, on Answering Brief for defendants-appellees Christopher Cobb and Board of Land and Natural Resources, State of Hawaii.

---

[21] Plaintiffs-appellants also argue strenuously that an EIS was required because HRS § 343-5(b) formerly provided that one should be filed before an agency "proposes to implement" an action. (§ 343-5(b) was formerly § 343-4(b), which was amended and renumbered in 1979). The pertinent "implementation" in their opinion occurred with the agreement's execution.

We are aware that NEPA and the California law have been applied consistently with this position. *See, e.g.,* Environmental Defense Fund, Inc. v. Corps of Engineers, 325 F. Supp. 728 (E.D. Ark. 1971), *aff'd,* 470 F.2d 289 (8th Cir. 1972), *cert. denied,* 412 U.S. 931 (1973); Sierra Club v. Hardin, 325 F. Supp. 99 (D. Alaska 1971); People v. County of Kearn, 39 Cal. App. 3d 830, 115 Cal. Rptr. 67 (1974). *See also* W. Rodgers, *supra,* § 7.7, at 766; H. Yarrington, The National Environmental Policy Act 32 (Envir. Rep. (BNA) Monograph No. 17, 1974). But the clear statement disfavoring retroactive application leads us to believe the legislature sought to avoid some of the problems encountered in the application of the federal and California statutes.

Joined in Reply Brief of Kaluakoi Corporation; Ratification of Answering Brief of Christopher Cobb and Board of Land and Natural Resources: *Roy Y. Yempuku,* Deputy Corporation Counsel, for defendant-appellee County of Maui.