PEARL RIDGE ESTATES COMMUNITY ASSOCIATION and DR. R. REGINALD PATTERSON, Appellants, *v.* LEAR SIEGLER, INC., a Delaware corporation; LEAR SIEGLER PROPERTIES, INC., a Delaware corporation; AMFAC-TROUSDALE, a Hawaii Joint Venture; DEPARTMENT OF PLANNING AND ECONOMIC DEVELOPMENT, State of Hawaii; DEPARTMENT OF GENERAL PLANNING, City and County of Honolulu; THE LAND USE COMMISSION OF THE STATE OF HAWAII; LIFE OF THE LAND, a Hawaii non-profit corporation; LLOYD GOMES; CHARLES H. NAKAGAWA; SIERRA CLUB, Hawaii Chapter; ANNA KAOHELAULII; PIG HUNTERS ASSOCIATION OF OAHU, and STEVE ROHRMAYR, Appellees

NO. 7934

(CIVIL NO. 59261)

JULY 16, 1982

RICHARDSON, C.J., LUM, NAKAMURA, PADGETT, JJ., AND RETIRED JUSTICE MENOR IN PLACE OF ASSOCIATE JUSTICE HAYASHI, RECUSED

OPINION OF THE COURT BY PADGETT, J.

This is an appeal from an order of the Circuit Court of the First Circuit affirming a Land Use Commission decision and order re-

classifying certain property situate Kalauao, District of Ewa, Oahu, Hawaii from conservation to urban. We reverse.

The decision and order of the Land Use Commission (hereinafter "LUC") was filed August 30, 1979.

Section 343-5(a)(2), HRS as amended by Act 197 of the Session Laws of 1979, provides:

Except as otherwise provided, an environmental assessment shall be required for actions which:

.    .    .    .

(2) Propose any use within any land classified as conservation district by the state land use commission under chapter 205.

Appellants contend that this language required an environmental assessment prior to the reclassification from conservation to urban. Appellees contend that the reclassification was not an "action" and that hence, no environmental assessment was required. The word "action" is defined in § 343-2(2) as follows:

"Action" means any program or project to be initiated by any agency or applicant.

Section 343-1, HRS, (which was a new section added by Act 197, Session Laws of 1979) provides:

The legislature finds that the quality of humanity's environment is critical to humanity's well being, that humanity's activities have broad and profound effects upon the interrelations of all components of the environment, and that an environmental review process will integrate the review of environmental concerns with existing planning processes of the State and counties and alert decision makers to significant environmental effects which may result from the implementation of certain actions. The legislature further finds that the process of reviewing environmental effects is desirable because environmental consciousness is enhanced, cooperation and coordination are encouraged, and public participation during the review process benefits all parties involved and society as a whole.

It is the purpose of this chapter to establish a system of environmental review at the state and county levels which will ensure that environmental concerns are given appropriate con-

sideration in decision making along with economic and technical considerations.

In adopting Act 197, the legislature expressed its concern with the preservation of the environment and indicated a desire that there be an environmental assessment with respect to any proposed use of conservation land. However, given the wording of § 343-5(a)(2), there could never be an environmental assessment because of such use after the land had been reclassified to urban since it would then no longer be classified as conservation. If, therefore, we accept the appellees' position, § 343-5(a)(2) would apply only where an application for a permit for such use is made to the Department of Land and Natural Resources (hereinafter "DLNR") pursuant to what is now § 13-2-19 of that department's regulations.

This would mean that someone desiring to make use of conservation lands would be subject to the issuance of an environmental assessment when applying for a permit from the DLNR under that department's highly restrictive regulations, but could, and would, avoid such a requirement entirely by simply applying to the LUC for a reclassification. In view of the wording of the statute, the legislative findings and the State's environmental policy (Chapter 344, HRS), we do not believe the legislature intended or the statute requires any such result. Certainly, had that been the intent of the statute, appropriate language to accomplish such a result could easily have been drafted. We hold that when an application is made for the reclassification of conservation lands to other uses, an environmental assessment is necessary before the LUC can reclassify the lands.

Accordingly, the judgment below is reversed and the case remanded for further proceedings.

*Scott R. Nakagawa* for appellants.

*Francis M. Izumi* for appellees, Lear Siegler, Inc. and Lear Siegler Properties, Inc.

*Benjamin M. Matsubara (Ukishima & Matsubara* of counsel) for appellee, Land Use Commission.

*Steven S. C. Lim,* Deputy Corporation Counsel, for appellee, Department of General Planning.

## CONCURRING OPINION OF NAKAMURA, J., WITH WHOM RICHARDSON, C.J., JOINS

I concur in the result reached by the court, for the judgment below is clearly subject to reversal. But I do not read HRS § 343-4(a)(2) (1976) (renumbered § 343-5(a)(2) in 1979) as being applicable to a petition for a district boundary amendment submitted to the Land Use Commission. The pertinent legislative mandates, in my opinion, are contained in HRS Chapter 205, whose demands with respect to a public agency's examination of the environmental effects of a proposed action are greater than those in HRS § 343-4. Moreover, the record does not demonstrate any neglect on the Commission's part to address environmental concerns. Its actual vice in effecting the reclassification, in my view, was a failure to heed the statutory command that "[i]nsofar as practicable conservation lands shall not be reclassified as urban lands."

I.

The subject land consists of 8.4 acres of vacant land situated at the crest of a ridge overlooking the Pearlridge Estates Subdivision in Central Oahu which were within the conservation district for purposes of the Land Use Law, HRS Chapter 205. The foregoing designation, however, did not correspond with the zoning of the land under County zoning ordinances. By action of the City Council early in 1977, the use designated for the subject land on the Oahu Interim Zoning Control Map had been changed from agricultural to residential and the use indicated on the Oahu General Plan Detailed Land Use Map had been amended from preservation to residential.

Appellees Lear Siegler, Inc. and Lear Siegler Properties, Inc. (Lear Siegler or petitioner) filed a Petition For Boundary Amendment From Conservation To Urban with the Land Use Commission on September 25, 1978. The request for change originally encompassed 10.2 acres of land, but the petitioner subsequently discovered 1.8 acres thereof were already within the urban district and amended the petition to reflect this fact. After due notice to interested persons, the Commission conducted a hearing in accord with the procedure prescribed by HRS Chapter 205. The appellants were among those who were permitted to intervene and participate

in the proceedings. The hearing which commenced on February 6, 1979 extended over a two-day period, and witnesses representing the petitioner, the Department of General Planning of the City and County of Honolulu, the Department of Planning and Economic Development of the State of Hawaii, and intervening parties presented testimony and documentary evidence in support of or in opposition to the petition. The intervenors included the Pearlridge Estates Community Association, Life of the Land, and a number of individuals. The organizations and individuals who participated in the hearing voiced numerous objections thereto, citing among other concerns the possibly deleterious effects of the proposed reclassification upon the environment.

The Decision and Order reclassifying the subject land as urban land was issued on August 30, 1979. The twenty-nine page document contained detailed findings of fact covering the gamut of subjects discussed by the parties in the course of the hearing. An appeal to the circuit court by some of the intervenors followed, and the Commission's decision was essentially affirmed.

## II.

The questions posed for determination, in my estimation, are whether an environmental assessment or an environmental impact statement as prescribed by HRS Chapter 343 was a prerequisite for the approval of the boundary amendment petition and whether the preconditions delineated in HRS Chapter 205 for the grant of a boundary change were satisfied. The issues compel the interpretation and reconciliation of two discrete statutes with related goals.

## A.

The earlier enactment, HRS Chapter 205, was passed in 1961 "in order to preserve, protect and encourage the development of the lands in the State for those uses to which they are best suited for the public welfare." S.L.H. 1961, c. 187, § 1.[1] The implementation of

---

[1] S.L.H. 1961, c. 187, § 1 read as follows:
   *Findings and declaration of purpose.* Inadequate controls have caused many of Hawaii's limited and valuable lands to be used for purposes that may have a

this three-pronged legislative policy called for a classification of all the lands in the State into three land-use districts[2] and a restriction of uses therein to those consistent with the classifications. The administration of the law was delegated to an independent commission, the Land Use Commission, and its primary function was to "classify and district" the lands. S.L.H. 1961, c. 187, § 2. But these initial determinations were not intended to be immutable as the statute contained provisions for subsequent boundary amendments, as well as periodic comprehensive reviews of "the classification and districting of all lands."[3] *Id.*

The statutory provisions governing district boundary amendments were reviewed by this court in *Town v. Land Use Commission,* 55 Haw. 538, 524 P.2d 84 (1974). We concluded, *inter alia,* that when the Commission considered a petition for boundary change that had been challenged by interested parties, it was involved in a "contested case" rather than in "rule making". *Id.* at 546-48, 524 P.2d at 89-91. In essence, we ruled it was then engaged in a quasi-judicial function. Consequently, detailed procedural requisites were written into HRS Chapter 205 in the following legislative session. *See* S.L.H. 1975, c.

---

short-term gain to a few but result in a long-term loss to the income and growth potential of our economy. Inadequate basis for assessing lands according to their value in those uses that can best serve both the well-being of the owner and the well-being of the public have resulted in inequities in the tax burden, contributing to the forcing of land resources into uses that do not best serve the welfare of the State. Scattered subdivisions with expensive, yet reduced, public services; the shifting of prime agricultural lands into nonrevenue producing residential uses when other lands are available that could serve adequately the urban needs; failure to utilize fully multiple-purpose lands; these are evidences of the need for public concern and action.

Therefore, the Legislature finds that in order to preserve, protect and encourage the development of the lands in the State for those uses to which they are best suited for the public welfare and to create a complementary assessment basis according to the contribution of the lands in those uses to which they are best suited, the power to zone should be exercised by the State and the methods of real property assessment should encourage rather than penalize those who would development [sic] these uses. (Note omitted).

[2] S.L.H. 1961, c. 187, § 2 established three land use districts, Agriculture, Conservation, and Urban. S.L.H. 1963, c. 205, § 2 added a fourth, Rural, to accommodate limited residential development in rural areas.

[3] However, the provision covering "five-year reviews" was repealed in 1975. *See* S.L.H. 1975, c. 193, § 9.

193. The Commission was also "constituted as a quasi-judicial body and mandated to make impartial decisions based on proven facts and established policies." S.L.H. 1975, c. 193, § 1.[4] Thus, no district boundary amendment may now be approved

> unless the commission finds upon the clear preponderance of the evidence that the proposed boundary is reasonable, not violative of section 205-2 and consistent with the interim policies and criteria established pursuant to section 205-16.1, or any state plan enacted by the legislature which plan shall supersede any interim guidance policies.

HRS § 205-4(h). And the interim policies which were effective at all relevant times provided, *inter alia,* that such amendments were subject to approval "only as reasonably necessary to accommodate growth and development, provided there are no significant adverse effects upon agricultural, natural, environmental, recreational, scenic, historic, or other resources of the area." HRS § 205-16.1 (1976).[5] With respect to conservation lands, the specific interdiction

---

[4] S.L.H. 1975, c. 193, § 1 read as follows:

*Findings and purpose.* The legislature finds that although the purposes of Hawaii's land use law remain as valid today as they were at the time of its enactment in 1961, the procedures through which these purposes must be realized have proved inadequate and unworkable. Under existing procedures the land use commission has been unable to reconcile in an orderly and rational manner the increasingly hostile and conflicting points of view which surround land use decisions. This Act sets forth reforms intended to insure the effective application for an established land use policy through an adversary process in which all interests will have the opportunity to compete in an open and orderly manner. The commission is constituted as a quasi-judicial body and mandated to make impartial decisions based on proven facts and established policies.

[5] HRS § 205-16.1 (1976) in its entirety read:

*Adoption of interim statewide land use guidance policy.* The legislature hereby adopts the following as interim statewide land use guidance policy set forth in this section. Except when the land use commission finds that an injustice or inequity will result, the commission shall observe and comply with these interim statewide land use guidance policies during the period commencing from [June 2, 1975,] until the effective date of the enactment of the state plan. The state plan shall be a long-range, comprehensive plan and policies which shall serve as a guide for the future long-range development of the State in accordance with chapter 225.

INTERIM STATEWIDE LAND USE GUIDANCE POLICY

The interim policies are:

> (1) Land use amendment shall be approved only as reasonably necessary

was that "[i]nsofar as practicable conservation lands shall not be reclassified as urban lands." *Id.*

### B.

The subsequent enactment, the Hawaii Environmental Protection Act (HEPA), HRS Chapter 343, was passed in 1974 "to establish a system of environmental review at the State and County levels which will ensure that environmental concerns are given appropriate consideration in decision-making along with economic and technical considerations." Conf. Comm. Rep. No. 27-74, in 1974 Senate Journal, at 775-76; Conf. Comm. Rep. No. 27, in 1974 House Journal, at 863-64. In reviewing HRS § 343-5 recently, we observed that HEPA's genesis was discernible in the National Environmental Policy Act of 1969 (NEPA). *Molokai Homesteaders Cooperative Association v. Cobb*, 63 Haw. 453, 464, 629 P.2d 1134, 1142 (1981). We further noted HEPA "is wider in scope than the federal or the typical state analogue, for the state law covers private actions in certain defined situations and areas." *Id.* at 465, 629 P.2d at 1143. Yet, "the

---

to accommodate growth and development, provided there are no significant adverse effects upon agricultural, natural, environmental, recreational, scenic, historic, or other resources of the area.

(2) Lands to be reclassified as an urban district shall have adequate public services and facilities or as can be so provided at reasonable costs to the petitioner.

(3) Maximum use shall be made of existing services and facilities, and scattered urban development shall be avoided.

(4) Urban districts shall be contiguous to an existing urban district or shall constitute all or a part of a self-contained urban center.

(5) Preference shall be given to amendment petitions which will provide permanent employment, or needed housing accessible to existing or proposed employment centers, or assist in providing a balanced housing supply for all economic and social groups.

(6) In establishing the boundaries of the districts in each county, the commission shall give consideration to the general plan of the county.

(7) Insofar as practicable conservation lands shall not be reclassified as urban lands.

(8) The commission is encouraged to reclassify urban lands which are incompatible with the interim statewide land use guidance policy or are not developed in a timely manner.

The State Plan was adopted through the enactment of S.L.H. 1978, c. 100, and became effective on May 22, 1978. But pursuant to the terms of HRS § 205-16.2 (Supp. 1981), the interim policies remained in effect until May 22, 1980.

prescribed role of the EIS [environmental impact statement] in the state environmental protection scheme is informational." *Id.; see* HRS § 343-2(9).

While HEPA was being considered by the legislature, the House Committee on Judiciary and Corrections offered a draft of the relevant measure that contained specific provisions making an EIS a prerequisite for any action proposing "the use of any land for which a change in land use district or classification, change in zoning or change in the county general plan is required." *See* H. B. No. 2067-74, H. D. 1;[6] Hse. Stand. Comm. Rep. No. 556-74, in 1974 House Journal, at 768. Although the House initially accepted this draft, the Senate did not. The Senate draft of the pertinent measure deleted the foregoing provisions and substituted language closely resembling that of HRS § 343-4. *See* H. B. No. 2067-74, H. D. 1, S. D. 1; Sen. Stand. Comm. Rep. No. 956-74, in 1974 Senate Journal, at 1126-27. And the final draft of the bill which was adopted by the legislature contained no reference to actions proposing "the use of any land for which a change in land use district or classification . . . is required." *See* S.L.H. 1974, c. 246, § 1.

## III.

The nature and character of the environmental assessment and the impact statement prescribed by HRS Chapter 343 and the foregoing legislative history, in my opinion, do not support a holding that HRS § 343-4(a)(2) is applicable to a petition for a boundary amendment. Furthermore, no reasonable basis appears for the legis-

---

[6] H. B. No. 2067-74, H. D. 1, as it emerged from the committee read in relevant part:

Sec. _____-3 *Requirements.* (a) Except as otherwise provided, an environmental impact statement shall be required, and its approval shall be a condition precedent, for:

. . . .

(2) Any action proposing the use of any land in the area between the shoreline and three hundred feet inland from the shoreline, the use of any land in a conservation district, the use of any land for the construction of resort and hotel facilities, or the use of any land for which a change in land use district or classification, change in zoning or change in the county general plan is required.

lature to compel an adherence thereto when proposals to reclassify conservation lands are presented but not when requests to reclassify other lands are.

A.

The nature and character of the environmental assessment and impact statement prescribed by HEPA suggest the Land Use Commission was not obligated to engage in an assessment pursuant to HRS § 343-4(a)(2) prior to rendering a decision here — it would have served no constructive purpose in light of the actual constraints imposed on the Commission by HRS § 205-16.1. The environmental assessment demanded by the former informs a government agency that a proposed action "may have a significant effect· on the environment." HRS § 343-4(b). If the agency so determines, it would then be compelled to secure an environmental impact statement. *Id.* But its acceptance merely signifies that the document "fulfills the definition of an environmental impact statement, adequately describes identifiable environmental impacts, and satisfactorily responds to comments received during the review of the statement." HRS § 343-1(1) (1976) (renumbered § 343-2(1) in 1979). Hence, HRS § 343-4 simply ensures agency consideration of environmental concerns before a decision is rendered. *Molokai Homesteaders Cooperative Association v. Cobb, supra,* 63 Haw. at 465, 629 P.2d at 1143; *Cf. Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 558 (1978) (NEPA's "mandate to the agencies is essentially procedural"). *See also Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227 (1980); *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n.21 (1976). But when the boundary amendment in question was under consideration, the Commission was subject to a mandate that a reclassification could be approved only if a clear preponderance of the evidence adduced at a contested hearing indicated it was "reasonably necessary to accommodate growth and development" and would cause "no significant adverse effects upon agricultural, natural, environmental, recreational, scenic, historic, or other resources of the area." HRS § 205-16.1.[7] An obligation to engage in an

---

[7] Although the interim policies articulated in HRS § 205-16.1 are no longer effective because a state plan has been adopted, HRS § 205-16 provides that "no amendment to any land use district boundary nor any other action by the land use

environmental assessment pales in comparison with these stringent preconditions for the approval of a boundary amendment.

### B.

HEPA's legislative history likewise conveys a definite suggestion that "a change in land use district or classification" does not trigger the requirement of an environmental assessment pursuant to HRS § 343-4. As noted, language that would have made such an assessment a requisite for a boundary change was incorporated in a preliminary draft of the relevant measure but dropped from subsequent drafts.[8] This deletion, I would conclude, manifests a design not to include a boundary amendment within the class of "actions" subject to HRS § 343-4. The requirement of environmental assessments for actions proposing "any use within any land classified as conservation district" in HRS § 343-4(a)(2) was in all likelihood meant to cover proposals for the use of conservation lands addressed to the agency empowered to regulate such use, the Board of Land and Natural Resources. *See* HRS § 183-41. Thus, neither the language nor the history of HRS § 343-4 furnishes reasonable grounds for construing it to apply to conservation district boundary amendments, particularly when boundary proposals implicating agricultural and rural lands obviously are not subject to its directives. For the pertinent restraints on the Commission are found elsewhere in the prevailing statutory scheme.

---

commission shall be adopted unless such amendment or other action conforms to the state plan."

A review of the Hawaii State Planning Act, HRS Chapter 226, indicates the interim policies have been restated in the state plan, though not necessarily in similar form. For example, HRS § 226-105 reads:

*Hawaii's land resources.* Priority actions for the use of Hawaii's resources:

(1) Preserve and improve shoreline open spaces and scenic resources.

(2) Seek to utilize Hawaii's limited land resources wisely in order to insure the protection of the environment and the availability of the shoreline, conservation lands and other limited resources for future generations.

(3) Seek to accommodate urban growth in existing urban areas while maintaining agricultural lands in agricultural designation.

[8] *See* note 6 *supra*, for provisions in H. B. No. 2067-74, H. D. 1, that would have made "a change in land use district or classification" subject to the requirements of HRS § 343-4.

## IV.

Although the Commission disregarded the provisions of HRS § 343-4(a)(2), it nonetheless weighed the possible environmental consequences of the reclassification as decreed by HRS § 205-16.1. The record substantiates an adherence to all of the interim policy guidelines delineated in the latter, save one. Ironically, the policy tailored for special application to petitions for reclassification of conservation land was the one ignored. Interim Policy No. 7 proclaimed that "[i]nsofar as practicable conservation lands shall not be reclassified as urban lands." But the Commission failed to appreciate the thrust of the guideline, for its conclusion in this regard was that "[i]t is practicable to reclassify the subject property to an urban district."

Reading the particular guideline within the context of the Land Use Law and its goals,[9] I would conclude the purpose of the policy was to retain conservation land as such unless a clear need for more urban land that could not be met otherwise was demonstrated or unless "injustice or inequity" would result from a denial of the request for amendment. Neither prerequisite for the reclassification from conservation to urban was satisfied.

The petitioner acknowledged that its own survey in 1978 indicated there were 706.5 acres of undeveloped lands designated for multi-unit residential use in Central and Leeward Oahu.[10] And when the attorney for an intervenor questioned a witness on whether "it is practicable not to have the subject property reclassified," the Commission's chairman displayed an insensitivity to the significance of the policy and nearly deflected meaningful inquiry thereon. The witness, who appeared on behalf of the Department of

---

[9] The Land Use Law was enacted "in order to preserve, protect and encourage the development of the lands in the State for those uses to which they are best suited for the public welfare." S.L.H. 1961, c. 187, § 1. Thus, conservation lands must be preserved if practicable, agricultural lands should be protected, and urban lands should be developed in an orderly fashion.

[10] Petitioner sought to have the classification changed in order to develop planned development housing (PDH) units. Its survey showed there were 706.5 acres of vacant land in Central and Leeward Oahu designated for multi-unit housing purposes, *i.e.,* either as PDH or A (apartment).

General Planning of the City and County of Honolulu, nevertheless acknowledged the practicability of retaining the land in the conservation district. The relevant portion of the transcript of the hearing before the Commission is reproduced in the margin.[11] Therefore, I would conclude the Commission failed to follow a pertinent command of HRS § 205-16.1 rather than HRS § 343-4(a)(2).

---

[11] The transcript reads in relevant part:

Q. Well so in your opinion it is practicable not to have the subject property reclassified from conservation to urban?

THE CHAIRMAN: Let's leave out the double negatives. Just ask him the question. Does he think its [sic] a good idea or a bad idea. I don't want this practicable and not practicable and all that business.

MR. NAKAGAWA: Well the thing is that the regulation is worded in terms of a negative, and the wording is that it shall not be reclassified from conservation to urban.

THE CHAIRMAN: Well ask him if he thinks it should or should not, and no double negatives.

MR. NAKAGAWA: Well let me think of a way to ask him that question.

Q. In your opinion is it practicable to have the subject property remain in conservation?

A. Yes, its [sic] practicable to have it remain in conservation; its [sic] also practicable, as we find, to reclassify the 5.4 acres to urban. Now bear in mind that we're not recommending reclassification of the other 3 acres we've just been discussing.

Tr. Vol. II, at 350-51.