90 P.3d 250

**EXOTICS HAWAI'I–KONA, INC.; Sharon Murakami as Special Representative for the Estate of Chiaki Kato; Harvey Tomono; Andraea Partners; Arvak Agronomics, Inc.; C & L Orchids and Island Agribusiness, Ltd.; Ernest Carlbom and Donna Carlbom; Cymbidium Partners; Floral Resources/Hawai'i, Inc.; Flowers, Inc.; Glenwood Cymbidium Partners; Green Point Nurseries, Inc.; Daniel Hata dba Hata Farm; Hawaiian Anthuriums, Ltd.; Hawaiian Greenhouses, Inc.; Hawaiian Heart, Inc.; Albert Isa dba Albert Isa Nursery; Kaimu Nursery, Inc.; Kaohe Nursery; Margaret Kincaid and Peter Kincaid dba Anuenue Farms; Kona Orchids, Inc.; Alan Kuwahara dba Puna Floriculture; James Kuwahara dba James S. Kuwahara Farm; Yoso Kuwahara, Inc.; Henry Liljedahl; Malaai Partners; James McCully; Mitsuo**

1859 Hawai'i Civil Code.

Miyatake dba Miyatake Farms; Curtis Nakaola dba Kona Grown Nurseries; George J. Nakashima dba Nakashima Farm; Jeffrey Newman dba Newman's Nurseries; Mark K. Nozaki dba Nozaki Farms; Big Rock Anthuriums, Inc.; Patrick Oka dba Oka Nursery; Carl Okamoto dba Carl Okamoto & Lehua Tropical Flowers; Clyde Okamoto dba Ho'onanea Farms; Wade Okamoto dba Paradise Anthuriums; Ronald Okazaki and Dora Okazaki dba Lehua Anthurium Nursery; Neal Okimoto dba Pacific Paradise Orchids; Orchid Partners; Pacific Nurseries, Inc.; Polynesian Orchids & Anthuriums, Inc.; Puna Flowers & Foliage, Inc.; Sunshine Farms; George Shiroma dba G. Shiroma Farms; Masato Shiroma dba Mae's Nursery; Masao Sunada; Samuel H. Taka and Sylvia A. Taka dba S. Taka; Yoshio Takemoto, Midori Takemoto, Cary Takemoto, Morris Takemoto and Norma Takemoto dba Takemoto Farm; Fetulima Tamasese dba Pacific Kona Orchids; Harold S. Tanouye & Sons, Inc.; Henry Terada and Loraine Y. Terada dba H & L Terada Farm; Vantage Partners; Uniwai I Limited Partners; Uniwai II Limited Partners; Waiakea Partners; Dwight E. Walker, Jr. and Bernice K. Walter dba Puna Ohana Flowers; Mark Willman dba Hawai'i Orchids; Exotics Hawai'i, Ltd., Plaintiffs–Appellees,

v.

E.I. DUPONT De NEMOURS & COMPANY, Allen Teshima; and Reginald Hasegawa, Defendants–Appellants.

No. 24626.

Supreme Court of Hawai'i.

May 18, 2004.

Warren Price, III (Kenneth T. Okamoto, Terence S. Yamamoto, and Robert S. Marks, with him on the briefs), of Price Okamoto Himeno & Lum, Honolulu, HI; and A. Stephens Clay, James F. Bogan, III, and C. Allen Garrett, Jr. (also on the briefs), of Kilpatrick Stockton LLP, Atlanta, GA, pro hac vice, for defendants-appellants.

Peter V.N. Esser (Melvin Y. Agena, with him on the briefs), Honolulu, HI; and Mark B. Hutton and Chan P. Townsley (also on the briefs), of Hutton & Hutton, Wichita, KS, pro hac vice, for plaintiffs-appellees.

Carl H. Osaki, Honolulu, HI; Kris A. LaGuire, Hilo, HI; Stephen T. Cox and Scott J. Allen, San Franciso, CA, pro hac vice; and A. Camden Lewis, Columbia, SC, pro hac vice, on the brief, for amicus curiae David Matsuura, individually and dba Orchid Isle Nursery, and Stephen Matsuura, individually and dba Hawaiian Dendrobium Farm.

MOON, C.J., LEVINSON, NAKAYAMA, RAMIL,* and ACOBA, JJ.

Opinion of the Court by MOON, C.J.

The Circuit Court of the Third Circuit, the Honorable Ronald Ibarra presiding, submitted the following reserved question to this court pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 15 (2000):[1] "Is the doctrine of nonmutual offensive issue preclusion recognized under Hawai'i law, and, if so, what standards govern its application?" Nonmutual offensive issue preclusion "occurs when the plaintiff seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party."[2] *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 4, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) [hereinafter, *Parklane*]; *see also Rosa v. CWJ Contractors, Ltd.*, 4 Haw.App. 210, 221, 664 P.2d 745, 752 (1983). Essentially, the issue the plaintiffs in this case seek to foreclose the defendants from relitigating centers around the defendants' fraudulent actions during the discovery phase of lawsuits underlying the instant action. In light of the following, we hold that nonmutual offensive issue preclusion is recognized under Hawai'i law. However, we express no opinion with respect to its applicability in this case and leave that decision to the trial court to decide pursuant to the standards set forth herein.

## I. BACKGROUND

### A. The Underlying Actions

Plaintiffs-appellees Exotics Hawai'i–Kona, Inc. and fifty-nine other named plaintiffs-appellees [hereinafter, collectively, the plaintiffs or Exotics] are among numerous commercial growers that filed lawsuits against E.I. du Pont de Nemours & Co. (DuPont) and others from November 1992 through March 1993 [hereinafter, the underlying actions], asserting products liability and other

---

* Associate Justice Ramil, who heard oral argument in this case, retired from the bench on December 30, 2002. *See* Hawai'i Revised Statutes (HRS) § 602–10.

1. HRAP Rule 15 provides:

 **Reserved Questions.**
 (a) **From What Court.** A circuit court, district court, family court, the land court, the tax appeal court and any other court empowered by statute, may reserve for the consideration of Hawai'i appellate courts a question of law arising in any proceedings before it. Questions may be reserved on motion of any party or on the court's own motion.
 (b) **Record.** The court reserving the question shall transmit as much of the record as may be necessary to a full understanding of the ques-

tions reserved to the appellate clerk. Certified copies may be transmitted in lieu of the original papers.
 (c) **Disposition.** The court to which the assignment judge assigns the question may make such disposition of the case as it deems proper. It may, in its discretion, return any reserved question for decision in the first instance by the court reserving it.
(Bold emphases in original.)

2. In contrast, nonmutual *defensive* issue preclusion "occurs when a defendant seeks to prevent a plaintiff from asserting a claim the plaintiff has previously litigated and lost against another defendant." *Parklane*, 439 U.S. at 326 n. 4, 99 S.Ct. 645; *see also Rosa*, 4 Haw.App. at 216, 664 P.2d at 750.

claims relating to Benlate, a fungicide manufactured by DuPont.[3] In September 1993, seventy-two actions concerning Benlate that were filed in the third circuit court, including those brought by the plaintiffs in the instant case, were consolidated for discovery purposes. Throughout discovery in 1993 and 1994, the plaintiffs filed numerous motions to compel and for sanctions alleging, *inter alia*, that DuPont had failed to comply with its discovery obligations. In particular, the parties disputed the discoverability of test results performed by Alta Laboratories [hereinafter, Alta test results], which the plaintiffs believed to be the "smoking gun" evidence necessary to show that Benlate was contaminated. *See Matsuura v. E.I. du Pont de Nemours & Co.*, 102 Hawai'i 149, 151, 73 P.3d 687, 689 (2003).

During the time period from April through October 1994, the plaintiffs in the instant case executed settlement agreements with DuPont.[4] However, some of the other plaintiffs in the underlying actions did not settle their claims, such as Kawamata Farms, Inc., as well as Stanley T. Tomono and Cynthia T. Tomono, owners and operators of S.T.T. Farms [hereinafter, collectively, the *Kawamata Farms* plaintiffs]. *Kawamata Farms, Inc. v. United Agric. Prods.*, 86 Hawai'i 214, 222, 948 P.2d 1055, 1063 (1997).

In May 1994, DuPont finally produced the Alta test results to those plaintiffs who had not settled their cases. *Matsuura*, 102 Hawai'i at 151, 73 P.3d at 689. Because the *Kawamata Farms* plaintiffs had not settled, their lawsuit went to trial in June 1994. *Id.* During trial, the *Kawamata Farms* plaintiffs utilized the Alta test results to show that Benlate may have been contaminated with toxins. *Id.* Ultimately, the *Kawamata Farms* plaintiffs prevailed and were awarded nearly $10 million in compensatory damages and more than $14 million in punitive damages. *Id.* (citation omitted). In addition, because the circuit court found that DuPont had engaged in serious discovery violations, it imposed sanctions of $1.5 million payable to the State of Hawai'i. *Id.*

Furthermore, after the verdict was entered, the *Kawamata Farms* plaintiffs learned of additional discovery violations, which they brought to the circuit court's attention via motion pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 60(b)(3) (1995).[5] *Id.* (citation omitted). In its HRCP Rule 60(b)(3) order, the circuit court found, *inter alia*, that some of "Du Pont's representations to this court ... were false and misleading[ ]" and that "Du Pont intentionally withheld ... crucial information in an effort to prevent the disclosure to the [*Kawamata Farms*] plaintiffs and this [c]ourt of Benlate and soil contamination data [ (*i.e.*, the Alta test results) ] disclosed in said documents which goes to the heart of this case." Moreover, the court amended several orders that it had previously entered because such orders "were based on misleading, incomplete, inaccurate and false information[.]" The court then sanctioned DuPont by ordering it to pay for the *Kawamata Farms* plaintiffs' attorneys' fees and costs.[6]

### B. The Instant Action

On January 6, 2000, the plaintiffs in the instant case filed their first amended com-

---

**3.** Similar actions were filed against DuPont throughout the United States. In July, 1993, the first trial involving Benlate commenced in a Georgia federal court.

**4.** The record on appeal does not indicate the settlement amounts for the plaintiffs in the instant action.

**5.** In 1995, HRCP Rule 60(b)(3) provided in pertinent part:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for ... fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentations, or other misconduct of an adverse party.... The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken.

*Matsuura*, 102 Hawai'i at 152, 73 P.3d at 690 n. 6 (citing HRCP Rule 60(b)(3) (1995)) (ellipsis points in original).

**6.** DuPont appealed from the judgment in the *Kawamata Farms* case, and this court affirmed the jury's verdict, the $1.5 million sanction, and the sanctions awarded pursuant to HRCP Rule 60(b)(3). *Matsuura*, 102 Hawai'i at 152, 73 P.3d at 690 (citation omitted).

plaint[7] in circuit court against DuPont, Allen Teshima,[8] Reginald Hasegawa,[9] and various Doe defendants [hereinafter, collectively, DuPont], alleging various "settlement fraud" claims.[10] They claimed that DuPont had defrauded them "into settling for pennies on the dollar for damages caused by its Benlate WP and Benlate DF fungicides." They also alleged that DuPont had, *inter alia*, intentionally failed to respond, testified falsely in prior depositions or trials, filed fraudulent, improper, or obstructive motions, disobeyed stipulations or court orders, and assumed false litigation positions. In response, DuPont filed a counterclaim alleging that, by filing suit, the plaintiffs had breached their settlement agreements, in which they had covenanted not to "commence or prosecute against DuPont any action based upon or in any way related to any claims which are the subject of the [settlement agreement r]elease."

On January 18, 2000, one of the plaintiffs in the instant action, Harvey Tomono, filed a motion for summary judgment on the issue of DuPont's fraudulent conduct. Therein, Tomono argued that *"[the circuit court's Rule 60(b)(3)] Discovery Fraud Order and the decision of the Hawaii Supreme Court in the Kawamata [Farms] [c]ase indisputably shows that Du Pont committed discovery fraud during the Consolidated Discovery phase of the Benlate Product [c]ases."* To-

mono also argued that "the doctrine of *[issue preclusion]* prevents *Du Pont from re-litigating or contesting the issue that it had committed discovery fraud* against Tomono." In response, DuPont contended that Hawai'i courts have not adopted the doctrine of nonmutual offensive issue preclusion and that such issue preclusion would be improper in this case.

Meanwhile, David Matsuura, individually and doing business as Orchid Isle Nursery, and Stephen Matsuura, individually and doing business as Hawaiian Dendrobium Farm (collectively, the Matsuuras), both of whom had settled with DuPont in the underlying actions, brought suit against DuPont on December 10, 1996 in the District Court of the District of Hawai'i (the district court), the Honorable David Alan Ezra presiding. *Matsuura,* 102 Hawai'i at 152, 73 P.3d at 690. The Matsuuras similarly alleged, *inter alia,* "fraud in the discovery and settlement processes." *Id.* at 152–53, 73 P.3d at 690–91. On May 24, 2001, the district court entered an order granting certification of three questions to this court.[11]

On August 6, 2001, the plaintiffs in the instant action stipulated to reserve the "identical" three questions of law to this court. In addition to the three questions, the circuit court also reserved a fourth question pertaining to the use of nonmutual offensive issue preclusion. This court accepted jurisdiction

7. The plaintiffs initially filed the original complaint on May 9, 1997. The original complaint was a class action filed "on behalf of all other persons similarly situated." However, because class certification was denied, the plaintiffs filed their first amended complaint on January 6, 2000, withdrawing all language relating to class procedure.

8. According to the plaintiffs, Teshima was the salesperson and representative of DuPont in Hawai'i at all times relevant.

9. According to the plaintiffs, Hasegawa was engaged in the importing and distributing of DuPont's Benlate products in Hawai'i.

10. Specifically, the plaintiffs asserted the following claims: intentional and negligent spoliation of evidence, fraud, fraudulent and negligent misrepresentation, non-disclosure, intentional interference with prospective economic advantage, civil conspiracy, violation of constitutional rights, and exemplary damages.

11. The questions certified by the district court were as follows:

1. Under Hawai'i law, is a party immune from liability for civil damages based on that party's misconduct, including fraud, engaged in during prior litigation proceedings?
2. Where plaintiffs' attorneys and others have accused the defendant of fraud and dishonesty during the course of prior, related litigation, are plaintiffs thereafter precluded as a matter of law from bringing a cause of action for fraudulent inducement to settle because they should not have relied on the Defendant's representations?
3. Does Hawai'i law recognize a civil cause of action for damages for intentional and/or negligent spoliation of evidence?

*Matsuura,* 102 Hawai'i at 150–51, 73 P.3d at 688–89.

over the reserved questions on October 31, 2001.[12]

On February 8, 2002, we consolidated this case with *Matsuura* for purposes of oral argument on the three identical questions presented to this court. Oral argument was held on April 18, 2002 and, on July 29, 2003, this court filed a published opinion regarding the three questions. *Matsuura*, 102 Hawai'i at 149, 154, 73 P.3d at 687, 692. We now address the fourth question—regarding non-mutual offensive issue preclusion—reserved by the circuit court.

## II. *DISCUSSION*

### A. *Whether Hawai'i Law Recognizes Non-mutual Offensive Issue Preclusion*

 The first part of the question before this court is whether the doctrine of nonmutual offensive issue preclusion is recognized under Hawai'i law. Because nonmutual offensive issue preclusion "occurs when the plaintiff seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action *with another party* [,]" *Parklane*, 439 U.S. at 326 n. 4, 99 S.Ct. 645 (emphasis added); *see also Rosa*, 4 Haw.App. at 221, 664 P.2d at 752, we must determine whether a plaintiff, who was not a party to a prior judgment, may nevertheless use that judgment "offensively" to prevent a defendant from relitigating an issue resolved against it in the earlier proceeding.

DuPont urges this court to "reject the controversial doctrine of nonmutual offensive issue preclusion as inconsistent with a party's right to a jury trial[.]" Although DuPont acknowledges that the United States Supreme Court in *Parklane* explicitly (1) recognized and applied such issue preclusion and (2) held· that it does not infringe upon a defendant's right to a jury trial, DuPont

nonetheless relies on *Parklane's* dissent in arguing that this court should decline to adopt the doctrine in light of a defendant's right to a jury trial.[13]

In response, Exotics contends that non-mutual offensive issue preclusion has already been recognized in Hawai'i, as evidenced by several Intermediate Court of Appeals (ICA) cases that have "expressly adopted the use of nonmutual offensive [issue preclusion]." Exotics cites to *In re Dowsett Trust*, 7 Haw.App. 640, 645 n. 3, 791 P.2d 398, 402 n. 3, *reconsideration denied*, 8 Haw.App. 661, 868 P.2d 465, *cert. denied*, 71 Haw. 667, 833 P.2d 900 (1990), for its notation that "[issue preclusion] may also be used offensively." Exotics also quotes at length from *Tradewind Ins. Co. v. Stout*, 85 Hawai'i 177, 938 P.2d 1196 (App.1997), *cert. denied*, 85 Hawai'i 81, 937 P.2d 922 (1997) [hereinafter, *Tradewind* ], which "directly applied nonmutual offensive [issue preclusion] ... and even expanded the traditional application of the doctrine." Exotics argues that "courts have steadily expanded the doctrine of issue preclusion to include nonparties to the original proceedings, reflecting the desirability of precluding relitigation of matters actually decided in a prior proceeding[.]"

### 1. Policies Underlying Issue Preclusion

 It is well-settled in our jurisdiction that

[r]es judicata, or claim preclusion, and collateral estoppel, or issue preclusion, are doctrines that limit a litigant to one opportunity to litigate aspects of the case to prevent inconsistent results and multiplicity of suits and to promote finality and judicial economy. Claim preclusion and issue preclusion are, however, separate

---

12. On December 13, 2001, the Matsuuras moved this court for leave to file an amicus curiae brief in this case. The Matsuuras alleged that they had "a direct interest in the resolution of one of the reserved questions ... concern[ing] the nonmutual offensive use of the [issue preclusion] doctrine[.]" On January 9, 2002, this court granted the Matsuuras' motion.

13. DuPont further argues that, in this case, nonmutual offensive issue preclusion would " 'significantly burden' and 'impair' DuPont's right to a jury determination of the factual issues raised by [the p]laintiff's fraud claims." However, as previously indicated, we express no opinion as to whether issue preclusion is appropriate under these facts and leave that decision for the trial court.

doctrines that involve distinct questions of law.[14]

*Bremer v. Weeks,* 104 Hawai'i 43, 53, 85 P.3d 150, 160 (2004) (internal quotation marks, citations, brackets, and footnote omitted). "Issue preclusion applies to a subsequent suit between the parties or their privies on a *different* cause of action and prevents the parties or their privies from relitigating *any issue* that was actually litigated and finally decided in the earlier action." *Id.* at 54, 85 P.3d at 161 (internal quotation marks omitted) (emphases in original). The party asserting issue preclusion bears the burden of establishing that

> (1) the issue decided in the prior adjudication is identical to the one presented in the action in question; (2) there is a final judgment on the merits; (3) the issue decided in the prior adjudication was essential to the final judgment; and (4) the party against whom [issue preclusion] is asserted was a party or in privity with a party to the prior adjudication. As to the fourth requirement, it is not necessary that the party asserting issue preclusion in the second suit was a party in the first suit.

*Id.* (citations omitted).

■ The policies underlying issue preclusion and claim preclusion are well-defined:

> The public interest staunchly permits every litigant to have an opportunity to try his case on the merits; but it also requires that he be limited to one such opportunity. Furthermore, public reliance upon judicial pronouncements requires that what has been finally determined by competent tribunals shall be accepted as undeniable legal truth. Its legal efficacy is not to be undermined. Also, these doctrines tend to eliminate vexation and expense to the parties, wasted use of judicial machinery and the possibility of inconsistent results.

*Ellis v. Crockett,* 51 Haw. 45, 56, 451 P.2d 814, 822 (1969) (citation and internal quotation marks omitted, *reh'g denied,* 51 Haw. 86, 451 P.2d 814 (1969)). Stated differently, issue preclusion and claim preclusion "share the common goals of preventing inconsistent results, preventing a multiplicity of suits, and promoting finality and judicial economy." *Dorrance v. Lee,* 90 Hawai'i 143, 148–49, 976 P.2d 904, 909–10 (1999).

## 2. Nonmutuality of Issue Preclusion

■ Traditionally, under the mutuality doctrine, "neither party could use a prior judgment as an estoppel against the other unless both parties were bound by the judgment." *Parklane,* 439 U.S. at 326–27, 99 S.Ct. 645. However, for purposes of *defensive* issue preclusion,[15] this court has explicitly abolished the mutuality requirement. In so doing, we have held that issue preclusion may be *"raised defensively by one not a party in a prior suit* against one who was a party in that suit and who himself raised and litigated the fact or issue." *Dorrance,* 90 Hawai'i at 148, 976 P.2d at 909 (citations omitted) (emphasis added); *see also Santos v. State, Dep't of Transp.,* 64 Haw. 648, 652, 646 P.2d 962, 965 (1982) (quoting same); *Morneau v. Stark Enters., Ltd.,* 56 Haw. 420, 423, 539 P.2d 472, 475 (1975) ("this jurisdiction has been classified as one in which the requirement of mutuality has been at least abandoned to permit a stranger to a judgment to rely upon it defensively against a party to such judgment, or a privy to such party[ ]" (citation omitted)); *Ellis,* 51 Haw. at 55–56, 451 P.2d at 822. Thus, a defendant who was not a party in a prior action may, in a subsequent action, preclude a plaintiff from asserting an issue that the plaintiff had previously litigated unsuccessfully against another defendant.

In *Morneau,* this court discussed the reasoning behind abolishing the mutuality re-

---

14. In previous decisions, this court has used the term res judicata to refer to both preclusion, in general, and claim preclusion, specifically. To avoid confusion resulting from the two uses of the term res judicata, this opinion will hereinafter use the term "claim preclusion" instead of res judicata and "issue preclusion" instead of collateral estoppel.

15. As previously indicated, defensive issue preclusion "occurs when a defendant seeks to prevent a plaintiff from asserting a claim the plaintiff has previously litigated and lost against another defendant." *Parklane,* 439 U.S. at 326 n. 4, 99 S.Ct. 645; *see also Rosa,* 4 Haw.App. at 216, 664 P.2d at 750.

quirement with respect to defensive issue preclusion. We noted that "cases which abandon the mutuality rule, whether in whole or in part, agree, expressly or by implication, that the doctrine of [issue preclusion] can be invoked by a stranger to the judgment only against one who was a party, or in privity with a party, to the judgment and had a full opportunity in the prior action to litigate the relevant issue." *Morneau,* 56 Haw. at 423, 539 P.2d at 475 (internal quotation marks and footnote omitted). The *Morneau* court noted:

> [n]o satisfactory rationalization has been advanced for the requirement of mutuality. Just why a party who was not bound by a previous action should be precluded from asserting it as [claim or issue preclusion] against a party who was bound by it is difficult to comprehend. Many courts have abandoned the requirement of mutuality and confined the requirement of privity to the party against whom the plea of [preclusion] is asserted.

56 Haw. at 424, 539 P.2d at 475 (citation, internal citation reference, and quotation marks omitted); *see also Parklane,* 439 U.S. at 328, 99 S.Ct. 645 (quoting same). Thus, the *Morneau* court concluded that

> the public interest staunchly permits every litigant to have an opportunity to try his case on the merits; but it also requires that he be limited to one such opportunity. Accordingly, we will not permit a plaintiff to have another opportunity to rehash the same claim the second time around by switching adversaries.

*Id.* at 424, 539 P.2d at 475–76 (internal quotation marks, brackets, and citation omitted).

In addition to abolishing the mutuality requirement for defensive issue preclusion, we have also noted that the United States Supreme Court has permitted and applied nonmutual *offensive* issue preclusion. *Moloka'i Homesteaders Coop. Ass'n v. Cobb,* 63 Haw. 453, 459 n. 10, 629 P.2d 1134, 1140 n. 10 (1981) [hereinafter *Cobb* ] (citing *Parklane,* 439 U.S. at 332, 99 S.Ct. 645; *Montana v. United States,* 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979)).

> The United States Supreme Court has applied [issue preclusion] liberally to fore-close repeated attempts to litigate issues. It *has held that the mutuality doctrine,* under which neither party could use a prior judgment against the other unless both parties were bound thereby, *no longer applies.* In the same case, *it further ruled that the offensive use of [issue preclusion] by plaintiffs was not necessarily foreclosed in every instance.*

*Cobb,* 63 Haw. at 459 n. 10, 629 P.2d at 1140 n. 10 (citing *Parklane,* 439 U.S. at 332, 99 S.Ct. 645; *Montana,* 440 U.S. at 154, 99 S.Ct. 970) (emphases added). We did not, however, reach the issue of whether nonmutual offensive issue preclusion was applicable in *Cobb* because we affirmed the circuit court's ruling on another basis. *Id.* at 459, 629 P.2d at 1140.

In *Parklane,* Leo Shore brought a stockholder's class action in federal court against Parklane Hosiery Company, Inc. (Parklane) and thirteen of its officers, directors, and stockholders, alleging that Parklane had issued a materially false and misleading proxy statement in connection with a merger. 439 U.S. at 324, 99 S.Ct. 645. Before Shore's class action went to trial, the Securities and Exchange Commission (SEC) filed suit against the same defendants in the same court, alleging that the proxy statement was materially false and misleading in essentially the same respects as alleged by Shore. *Id.* at 324, 99 S.Ct. 645. In the SEC case, the district court found that the proxy statement was materially false and misleading and entered a declaratory judgment to that effect, which the United States Court of Appeals for the Second Circuit affirmed. *Id.* (citations omitted). Subsequently, in the class action, Shore moved for partial summary judgment against the defendants, asserting that they were estopped from relitigating certain issues that had been resolved against them in the SEC action. *Id.*

Inasmuch as Shore, who asserted issue preclusion in the class action, was not a party in the SEC action, the Supreme Court was faced with determining "whether a litigant who was not a party to a prior judgment may nevertheless use that judgment 'offensively' to prevent a defendant from relitigating issues resolved in the earlier proceeding." *Id.*

at 326, 99 S.Ct. 645. The Court recalled that it had previously abolished the mutuality requirement for issue preclusion when used *defensively.* *Id.* at 327, 99 S.Ct. 645 (citation omitted). The Court explained its reasons for so doing:

> In any lawsuit where a defendant, because of the mutuality principle, is forced to present a complete defense on the merits to a claim which the plaintiff has fully litigated and lost in a prior action, there is an arguable misallocation of resources. To the extent the defendant in the second suit may not win by asserting, without contradiction, that the plaintiff had fully and fairly, but unsuccessfully, litigated the same claim in the prior suit, the defendant's time and money are diverted from alternative uses—productive or otherwise—to relitigation of a decided issue. And, still assuming that the issue was resolved correctly in the first suit, there is reason to be concerned about the plaintiff's allocation of resources. Permitting repeated litigation of the same issue as long as the supply of unrelated defendants holds out reflects either the aura of the gaming table or a lack of discipline and of disinterestedness on the part of the lower courts, hardly a worthy or wise basis for fashioning rules of procedure.

*Id.* (citations and internal quotation marks omitted).

Because the *Parklane* Court had previously abolished the mutuality requirement for purposes of defensive issue preclusion, it was faced with determining whether (1) to treat offensive and defensive issue preclusion similarly by abolishing the mutuality requirement for offensive issue preclusion or (2) to treat them differently by declining to abolish the mutuality requirement for offensive issue preclusion. In making its decision, the Court noted that "several reasons have been advanced why [offensive and defensive issue preclusion] should be treated differently." *Id.* at 329, 99 S.Ct. 645. The *Parklane* Court noted the specific reasons against abolishing the mutuality requirement for purposes of offensive issue preclusion:

> First, *offensive use of [issue preclusion] does not promote judicial economy in the same manner as defensive use does.* Defensive use of [issue preclusion] precludes a plaintiff from relitigating identical issues by merely switching adversaries. Thus defensive [issue preclusion] gives a plaintiff a strong incentive to join all potential defendants in the first action if possible. Offensive use of [issue preclusion], on the other hand, creates precisely the opposite incentive. Since a plaintiff will be able to rely on a previous judgment against a defendant but will not be bound by that judgment if the defendant wins, the plaintiff has every incentive to adopt a "wait and see" attitude, in the hope that the first action by another plaintiff will result in a favorable judgment. Thus offensive use of [issue preclusion] will likely increase rather than decrease the total amount of litigation, since potential plaintiffs will have everything to gain and nothing to lose by not intervening in the first action.
>
> A second argument against *offensive use of [issue preclusion]* is that it *may be unfair to a defendant.* If a defendant in the first action is sued for small or nominal damages, he may have little incentive to defend vigorously, particularly if future suits are not foreseeable. Allowing offensive use of [issue preclusion] may also be *unfair to a defendant if the judgment relied upon as a basis for the [preclusion] is itself inconsistent with one or more previous judgments in favor of the defendant.* Still another situation where it might be unfair to apply offensive [preclusion] is where the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result.

*Id.* at 329–30, 99 S.Ct. 645 (citations, footnotes, and some internal quotation marks omitted) (emphases added).

Irrespective of the arguments against permitting nonmutual offensive issue preclusion, the Court nevertheless held that

> the preferable approach for dealing with these problems in the federal courts is not to preclude the use of offensive [issue preclusion], but *to grant trial courts broad discretion to determine when it should be applied.* The general rule should be that

in cases where a plaintiff could easily have joined in the earlier action or where, either for the reasons discussed above or for other reasons, the application of offensive [preclusion] would be unfair to a defendant, a trial judge should not allow the use of offensive [issue preclusion].

*Id.* at 331, 99 S.Ct. 645 (footnote omitted) (emphasis added).

▉▉▉ Furthermore, we note that the *Parklane* Court held that application of nonmutual offensive issue preclusion is "not repugnant to the Seventh Amendment" right to a jury trial. *Id.* at 337, 99 S.Ct. 645. The Court stated that

[a] litigant who has lost because of adverse factual findings in an equity action is equally deprived of a jury trial whether he is [precluded] from relitigating the factual issues against the same party or a new party. In either case, the party against whom estoppel is asserted has litigated questions of fact, and has had the facts determined against him in an earlier proceeding. In either case *there is no further factfinding function for the jury to perform, since the common factual issues have been resolved in the previous action.* No one is entitled in a civil case to trial by jury, unless and except so far as there are issues of fact to be determined.

*Id.* at 335–36, 99 S.Ct. 645 (citation, internal quotation marks, and parentheses omitted). Although DuPont contends that recognition of nonmutual offensive issue preclusion may impair a defendant's right to a jury trial, it, like the petitioners in *Parklane*, "advance[s] no persuasive reason ... why the meaning of the Seventh Amendment should depend on whether or not mutuality of parties is present." *Id.* at 335, 99 S.Ct. 645. Furthermore, "we have deemed the interpretation of the seventh amendment by the federal courts highly persuasive in construing the right to a civil jury trial in Hawai'i." *SCI Mgmt. Corp. v. Sims,* 101 Hawai'i 438, 447, 71 P.3d 389, 398 (2003) (citations, internal quotation marks, and brackets omitted). Thus, we discern no reason to depart from the *Parklane* Court's decision that nonmutual offensive issue preclusion does not violate a defendant's constitutional right to a jury trial.

In addition to the Supreme Court's recognition of nonmutual offensive issue preclusion, we note that many of our sister jurisdictions have also chosen to approve the doctrine. *See, e.g., Briggs v. Newton,* 984 P.2d 1113, 1120 (Alaska 1999) ("A party may invoke nonmutual offensive [issue preclusion.]"); *Preferred Am. Ins. v. Dulceak,* 302 Ill.App.3d 990, 235 Ill.Dec. 974, 706 N.E.2d 529, 532 (1999) (noting that "mutuality of parties is no longer required[ ]" for offensive issue preclusion (citation omitted)); *Tofany v. NBS Imaging Sys., Inc.,* 616 N.E.2d 1034, 1038 (Ind.1993) ("we hold that offensive [issue preclusion] may be used"); *State Mut. Ins. Co. v. Bragg,* 589 A.2d 35, 37 (Me.1991) ("We permit the use of offensive, nonmutual [issue preclusion] on a case by case basis if it serves the ends of justice." (Citation omitted.)); *Leeds Fed. Sav. & Loan Ass'n v. Metcalf,* 332 Md. 107, 630 A.2d 245, 249 n. 4 (1993) ("Nonmutual [issue preclusion] can be invoked offensively or defensively." (Citation omitted.)); *Rymer v. Estate of Sorrells by and Through Sorrells,* 127 N.C.App. 266, 488 S.E.2d 838, 840 (1997) ("We find that our state does authorize the non-mutual, offensive use of [issue preclusion.]"); *McPherson v. South Carolina Dep't of Highways & Pub. Transp.,* 297 S.C. 303, 376 S.E.2d 780, 781–82 (S.C.Ct.App.1989) (affirming the trial court's application of nonmutual offensive issue preclusion).

Moreover, we agree with Exotics that the ICA's decision in *Tradewind,* 85 Hawai'i at 186, 938 P.2d at 1205, lends support that nonmutual offensive issue preclusion has already been recognized in Hawai'i. *See also In re Dowsett Trust,* 7 Haw.App. at 645 n. 3, 791 P.2d at 402 n. 3 ("[Issue preclusion] may also be used offensively."). *Tradewind* involved a criminal conviction and two subsequent civil lawsuits. 85 Hawai'i at 179, 181, 938 P.2d at 1198, 1200. In that case, eighteen-year-old Romel Castro was convicted of, *inter alia,* attempted murder in the second degree for shooting his high school teacher, Rosemary H. Stout. *Id.* at 178, 181, 938 P.2d at 1197, 1200. Subsequently, on June 26, 1990, Stout filed a civil complaint for personal injuries against Castro, his parents, and various Doe defendants. *Id.* at 181, 938 P.2d

at 1200. Because Castro was insured under his parent's homeowner's insurance policy issued by Tradewind Insurance Company, Ltd. (Tradewind), on October 28, 1991, Tradewind filed a complaint for declaratory judgment against Stout, Castro, and Castro's parents.[16] *Id.* at 179, 938 P.2d at 1198. Tradewind alleged that, because Castro had been found guilty of attempted murder and because the insurance policy excluded coverage for bodily injury that was "intended by the insured[,]" it was not required to defend or indemnify Castro or to pay Stout benefits for her personal injuries caused by Castro. *Id.* Tradewind further alleged that, because the jury in Castro's criminal case had found that Castro "intended" to harm Stout by finding him guilty of attempted murder, Stout was precluded from relitigating the issue of Castro's intent.[17]

In determining whether Tradewind could preclude Stout from relitigating Castro's intent, the *Tradewind* court noted that Tradewind was not a party or in privity with a party in the criminal case. *Id.* at 185, 938 P.2d at 1204. However, the ICA stated that "the concept of privity or mutuality has expanded to bind nonparties." *Id.* (citation omitted).

The ICA also recognized that it was "faced with a further extension of the [issue preclusion] doctrine because Tradewind, a nonparty to the prior criminal trial, seeks to use [issue preclusion] to preclude Stout, *who was also a nonparty to the criminal case,* from relitigating the issue of [Castro]'s intent in the declaratory action." *Id.* at 186, 938 P.2d at 1205. Consequently, the *Tradewind* court considered "equitable factors" to ensure that Stout's due process rights were not violated:

> [D]ue process requires that the estopped party have an identity or community of interest with, and adequate representation by, the losing party in the first action and reasonably expects to be bound by the prior adjudication. When applying this rule, ... various equitable factors ... must be considered:
>
> > Whether it would be *generally unfair* in the second case to use the result of the first case, whether assertion of the plea of estoppel by a stranger to the judgment would *create anomalous [results],* whether the party adversely affected by the [issue preclusion] offers a *sound reason why he should not be bound by the judgment,* and whether the first case was *litigated strenuously or with vigor.*

*Id.* at 187–88, 938 P.2d at 1206–07 (citations, internal quotation marks, and brackets omitted) (emphases added). After considering the "equitable factors,"[18] the court held that "[t]he policies of promoting judicial economy by minimizing repetitive litigation, preventing inconsistent judgments which undermine the integrity of the judicial system, and protecting against vexatious litigation" supported application of issue preclusion in that case. *Id.* at 188, 938 P.2d at 1207 (citation and footnote omitted).

We note, however, that the *Tradewind* court did not label the type of issue preclusion it applied as either "offensive" or "defensive." Nevertheless, DuPont contends that *Tradewind* involved defensive—not offensive—issue preclusion. Although DuPont acknowledges that, in *Tradewind,* the plaintiff (Tradewind) asserted issue preclusion against the defendants (Castro and Stout), DuPont argues that, because of "the reversed posture of cases in a declaratory judgment context[,] ... [Tradewind]'s action was essentially defensive in nature." Exotics, however, maintains that "*offensive* use of

---

16. Island Insurance Company, Ltd. (Island), the insurer under an automobile insurance policy issued to Castro's parents, joined Tradewind in the complaint for declaratory judgment. *Tradewind,* 85 Hawai'i at 179 n. 1, 938 P.2d at 1198 n. 1. However, Island was not named as a party on appeal. *Id.* at 179 n. 4, 938 P.2d at 1198 n. 4.

17. Stout sought to show that, because Castro was "'high' on crystal meth[ ]" at the time of the shooting and was unable to rationally govern his conduct, he did not "intend" to harm Stout.

*Tradewind,* 85 Hawai'i at 179, 183, 938 P.2d at 1199, 1202.

18. The ICA noted that, because "an injured person [ (Stout) ] may stand in the shoes of the insured [ (Castro) ] in a subsequent civil litigation involving identical issues fully litigated and determined on the merits in a prior criminal trial[,]" issue preclusion could be asserted against Stout, as well as Castro. *Id.* at 186–87, 938 P.2d at 1205–06.

nonmutual issue preclusion was fully adopted in *Tradewind*[.]"

Although it is true, as DuPont points out, that the Texas court of appeals in *Mann*, 975 S.W.2d at 351, held that issue preclusion asserted by a plaintiff in a declaratory judgement action "is defensive[,]" *id.*, we note that other jurisdictions disagree. *See, e.g., Burlington N. R.R. Co. v. Hyundai Merchant Marine Co.*, 63 F.3d 1227, 1232 n. 4 (3d Cir.1995) (Where a plaintiff in a declaratory judgment action asserts issue preclusion, it "involves the application of offensive [issue preclusion]. The fact that [the plaintiff] preemptively brought this action for declaratory judgment, seeking to avoid indemnity liability, does not alter the structural essence of the case."); *Aetna Cas. & Sur. Co. v. Jones*, 220 Conn. 285, 596 A.2d 414, 424 n. 19 (1991) ("Because this is a declaratory judgment action and the plaintiff insurer is invoking [issue preclusion] to avoid providing coverage, the [issue preclusion] invoked here is a hybrid form of offensive [issue preclusion]."); *Revenue Cabinet, Commonwealth v. Samani*, 757 S.W.2d 199, 201 (Ky.Ct.App. 1988) ("Offensive collateral estoppel or issue preclusion may be utilized, as was done herein, by an action for declaratory relief." (Footnote omitted.)); *American Family Mut. Ins. Co. v. Savickas*, 193 Ill.2d 378, 250 Ill.Dec. 682, 739 N.E.2d 445, 452 (2000) (recognizing that issue preclusion brought by a plaintiff in a declaratory judgment action "is technically 'offensive[ ]' "); *cf. Davis v. Davis*, 663 A.2d 499, 501 n. 3 (D.C.1995) (noting that, in a declaratory judgment action, *defensive* issue preclusion occurs where the *defendant*—not the plaintiff—asserts issue preclusion).

The Indiana court of appeals, in *Meridian Ins. Co. v. Zepeda*, 734 N.E.2d 1126 (Ind.Ct. App.2000) [hereinafter *Meridian* ], a case with substantially similar facts as in *Tradewind*, applied offensive—not defensive—issue preclusion. In *Meridian*, Simon Zepeda shot Ernest King, causing King to become paralyzed from the neck down. 734 N.E.2d at 1128. Zepeda was charged and convicted of aggravated battery for shooting King. *Id.* A week before the criminal trial had ended, King filed a personal injury action against

Zepeda. *Id.* Zepeda's insurer, Meridian Insurance (Meridian), assumed Zepeda's defense in the personal injury action with a reservation of rights and also filed a complaint for declaratory judgment against Zepeda and King. *Id.* In its complaint, Meridian alleged that, because Zepeda had been found guilty of aggravated battery and his insurance policy excluded coverage for injuries that were "intended by the insured," it was not required to provide coverage for Zepeda's acts. *Id.* (internal quotation marks omitted). Meridian also filed a summary judgment motion, asserting that Zepeda's criminal conviction barred Zepeda and King from relitigating the issue of Zepeda's intent. *Id.* at 1129. The trial court denied the motion. *Id.*

On appeal, the Indiana court of appeals held that, because "the issue of whether Zepeda's acts were ... intended was necessarily litigated in the criminal trial[,]" and because "Zepeda had a full and fair opportunity to litigate the intent issue in his criminal trial and it is not unfair to apply [issue preclusion] against him[,]" the trial court erred by refusing to apply offensive issue preclusion to estop Zepeda (the criminal defendant) from relitigating his intent. *Id.* at 1130. With respect to whether King (the victim) was estopped from relitigating Zepeda's intent, the court recognized that Zepeda's conviction "may provide a basis for the *offensive* use of [issue preclusion]." *Id.* at 1131 (citation omitted) (emphasis added). However, the court concluded that, because King did not have a full and fair opportunity to litigate the issue of Zepeda's intent, "it would be unfair to allow the use of offensive [issue preclusion.]" *Id.* at 1132. Thus, although the court declined to estop King from relitigating the issue of Zepeda's intent, it acknowledged that offensive—not defensive—issue preclusion would have been proper if such application was not unfair to King. *Id.* ·Therefore, as in *Tradewind*, where a plaintiff in a declaratory action asserts issue preclusion against a defendant, offensive—not defensive—issue preclusion applies.

■ In addition to the decisions of the Supreme Court in *Parklane* and the ICA in *Tradewind*, the policies underlying issue pre-

clusion also favor recognition of nonmutual offensive issue preclusion. First, foreclosing a defendant from relitigating an issue that he has previously litigated unsuccessfully will limit him to one opportunity to try his case on the merits and will preclude him from "rehash[ing] the same [issue] the second time around[.]" *Morneau*, 56 Haw. at 424, 539 P.2d at 476; *see also Bremer*, 104 Hawai'i at 53, 85 P.3d at 160; *Morneau*, 56 Haw. at 424, 539 P.2d at 475–76; *Ellis*, 51 Haw. at 56, 451 P.2d at 822. This will prevent a "multiplicity of suits[.]" *See Bremer*, 104 Hawai'i at 53, 85 P.3d at 160; *Dorrance*, 90 Hawai'i at 148, 976 P.2d at 909. Additionally, precluding a defendant from relitigating such an issue will ensure that "what has been finally determined by competent tribunals [will] be accepted as undeniable legal truth[ ]" and that the legal efficacy of judicial pronouncements will not be undermined. *See Ellis*, 51 Haw. at 56, 451 P.2d at 822. This will promote finality and judicial economy. *See Bremer*, 104 Hawai'i at 53, 85 P.3d at 160. Furthermore, adopting nonmutual offensive issue preclusion will "eliminate vexation and expense to the parties" and prevent inconsistent results. *Ellis*, 51 Haw. at 56, 451 P.2d at 822; *see Bremer*, 104 Hawai'i at 53, 85 P.3d at 160. Thus, recognizing nonmutual offensive issue preclusion will further the policies underlying issue preclusion.

In sum, inasmuch as (1) we have acknowledged that "it is not necessary that the party asserting issue preclusion in the second suit was a party in the first suit[,]" *Bremer*, 104 Hawai'i at 54, 85 P.3d at 161, (2) we find *Parklane* and *Tradewind* to be persuasive, and (3) we believe that the use of nonmutual offensive issue preclusion will assist our courts in preventing unnecessary relitigation of issues and will promote consistency of judgments and judicial economy, we now explicitly adopt and recognize the doctrine of nonmutual offensive issue preclusion. Accordingly, we now turn to the second part of the reserved question.

### B. Standards Governing Nonmutual Offensive Issue Preclusion

The circuit court also requests this court to determine the standards that shall govern the application of nonmutual offensive issue preclusion. DuPont urges this court to adopt five "fairness factors" to be used by courts when deciding whether to apply offensive issue preclusion in a given case. Under the five factors proposed by DuPont, a court is required to determine whether:

(1) treating the issue as conclusively determined may *complicate determination of issues in the subsequent action or prejudice the interests of another party* thereto; (2) the determination relied on as preclusive was itself *inconsistent* with another determination of the same issue; (3) the forum in the second action affords the party against whom preclusion is asserted *procedural opportunities* in the presentation and determination of the issue that were not available in the first action and could likely result in the issue being differently determined; (4) the person seeking to invoke favorable preclusion, or to avoid unfavorable preclusion could have effected *joinder* in the first action between himself and his present adversary; or (5) whether the *later action was foreseeable* at the time of the first.[19]

(Internal quotation marks and brackets omitted.) (Emphasis added.) DuPont requests this court to formally adopt the five factors inasmuch as, DuPont contends, "[t]hese factors directly address the fairness concerns implicated by nonmutual offensive issue preclusion."

In response, Exotics argues that this court need not adopt the five factors advanced by DuPont. Rather, Exotics maintains that "[t]he four-part test for [issue preclusion] identified by this [c]ourt in *Dorrance* is the appropriate focus of analysis for courts faced with preclusion claims." Exotics reasons that the four-part test "is consistent with the public policies underlying [issue preclusion] in Hawaii, policies which favor consistency,

---

19. We note that DuPont applies each "fairness factor" to the instant case in an attempt to argue that application of issue preclusion in this case would be unfair and, therefore, improper. However, as previously indicated, we express no opinion as to whether issue preclusion is appropriate in the instant case.

finality, and conservation of judicial resources over relitigation of previously decided issues." Exotics also points out that the "two part consideration" for determining whether to give preclusive effect to quasi-judicial administrative hearings also provides adequate inquiry into whether application of nonmutual offensive issue preclusion would be proper.[20]

▪▪▪ As previously indicated, four requirements must be satisfied before issue preclusion may be applied in any case:

(1) the issue decided in the prior adjudication is identical to the one presented in the action in question; (2) there is a final judgment on the merits; (3) the issue decided in the prior adjudication was essential to the final judgment; and (4) the party against whom [issue preclusion] is asserted was a party or in privity with a party to the prior adjudication.

*Dorrance,* 90 Hawai'i at 149, 976 P.2d at 910. Additionally, issue preclusion "should be qualified or rejected when its application would contravene an overriding public policy or result in manifest injustice[.]" *See Yarnell v. City Roofing, Inc.,* 8 Haw.App. 543, 556–57, 812 P.2d 1199, 1206 (citation omitted), *rev'd in part on other grounds,* 72 Haw. 272, 813 P.2d 1386 (1991); *State ex rel. Price v. Magoon,* 75 Haw. 164, 189, 858 P.2d 712, 724, (1993) (noting that "[t]he [preclusion] doctrine ... is a rule of fundamental and substantial justice[and] of public policy" (citation omitted)). Thus, even where issue preclusion is utilized offensively, the four requirements must be established by the party asserting preclusion, and the court must consider whether preclusion would contravene public policy or result in manifest injustice.

As DuPont notes, the Supreme Court in *Parklane* highlighted several public policy concerns to be considered by district courts when determining the applicability of offensive issue preclusion. First, the Court reasoned that, because potential plaintiffs may adopt a "wait and see" attitude instead of intervening in the prior action, district courts should not permit nonmutual offensive issue preclusion "where a plaintiff could easily have joined in the earlier action[.]" *Parklane,* 439 U.S. at 331, 99 S.Ct. 645 (citations omitted). Second, the Court concluded that offensive issue preclusion should not be applied where it would be "unfair to a defendant." *Id.* at 330, 99 S.Ct. 645. The Court explained that preclusion may be unfair where the defendant had "little incentive to defend vigorously[ ]" in the first action, such as where the defendant is "sued for small or nominal damages" or where "future suits are not foreseeable." *Id.* (citations omitted). Furthermore, preclusion may be unfair to a defendant "if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant." *Id.* The Court also stated that preclusion may be unfair "where the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result." *Id.* at 330–31, 99 S.Ct. 645. Finally, the Court noted that "other reasons" may make application of offensive issue preclusion unfair to a defendant. *Id.* at 331, 99 S.Ct. 645. Thus, we note that the *Parklane* Court advised district courts addressing this issue to consider the same factors that DuPont now urges this court to adopt.

▪▪▪ Inasmuch as our law requires trial courts to consider whether issue preclusion "would contravene an overriding public policy or result in manifest injustice[,]" *Yarnell,* 8 Haw.App. at 556–57, 812 P.2d at 1206 (citation omitted), we agree with the *Parklane* Court that trial courts, when determining whether nonmutual offensive issue preclusion is applicable in a given case, shall, where

---

20. The two part consideration for determining whether to give preclusive effect to a quasi-judicial administrative hearing is as follows:

The first consideration is procedural. The essential issue is a comparison of the *quality and intensiveness of the opportunity to litigate, and the incentive to litigate,* in the original litigation as compared to the opportunity and incentive in the second litigation.... Assuming that the procedural opportunity afforded in the original action warrants normal application of the rules of [preclusion], a second consideration arises. That consideration is whether *extrinsic policies* indicate that the second forum should nevertheless examine the matter in question anew. *State v. Alvey,* 67 Haw. 49, 54, 678 P.2d 5, 8–9 (1984) (citation omitted) (ellipsis points in original) (emphases added).

applicable, consider whether the plaintiff could easily have joined in the earlier action or whether preclusion would be unfair to the defendant. However, we choose not to limit the vast array of public policy considerations to the five factors enumerated by DuPont. As the Supreme Court noted in *Parklane,* "other reasons" may exist that would make issue preclusion improper in a given case. *See Parklane,* 439 U.S. at 331, 99 S.Ct. 645; *see also In re Air Crash at Detroit Metro. Airport,* 776 F.Supp. 316, 324 (E.D.Mich. 1991). (noting that the *Parklane* factors are "not exhaustive[ ]"); *Tofany,* 616 N.E.2d at 1038 ("The factors to be considered [by courts applying offensive issue preclusion], discussed here and in *Parklane* [ ], are not exhaustive, but rather provide a framework for the trial court to utilize."); *Restatement (Second) of Judgments* § 29 (1982) (enumerating additional factors that may be considered prior to applying preclusion, as well as any "other compelling circumstances"). Therefore, inasmuch as trial courts determine whether preclusion is proper on a case by case basis, and because policy considerations will vary among cases depending on their specific facts, we hold that, when determining whether nonmutual offensive issue preclusion will contravene overriding public policies or result in manifest injustice, trial courts shall consider the *Parklane* factors where applicable, as well as any other relevant policy considerations.

## III. *CONCLUSION*

Based on the foregoing, we hold that (1) Hawai'i law recognizes nonmutual offensive issue preclusion, and (2) in determining whether such preclusion is applicable in a given case, the trial court must determine whether the *Dorrance* four-part test is satisfied and ensure that preclusion will not contravene overriding public policies or result in manifest injustice. In so doing, trial courts shall consider the *Parklane* factors where applicable, as well as any other relevant policy considerations.